724 F.2d 979
 20 ERC 1097, 233 U.S.App.D.C. 95, 14
Envtl. L. Rep. 20,110
 GENERAL MOTORS CORPORATION, a Delaware Corporation, Petitioner,
v.
William D. RUCKELSHAUS, Administrator, United States
Environmental Protection Agency, Respondent.
GENERAL MOTORS CORPORATION, a Delaware Corporation, Petitioner,
v.
William D. RUCKELSHAUS, Administrator, United States
Environmental Protection Agency, Respondent.
GENERAL MOTORS CORPORATION, a Delaware Corporation, Petitioner,
v.
William D. RUCKELSHAUS, Administrator, United States
Environmental Protection Agency, Respondent.
 Nos. 80-1868, 80-2027, 81-1029.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 13, 1983.
Decided Dec. 16, 1983.
 
 Petitions for Review of an Order of the Environmental Protection agency.
 George F. Ball and Theodore Souris, Detroit, Mich., with whom William L. Weber, Jr., Michael B. Lewiston, James A. Smith, Terrence B. Larkin, and Frederick J. Dindoffer, Detroit, Mich., were on brief, for petitioner.
 Samuel I. Gutter, Atty., E.P.A., Washington, D.C., with whom Angus MacBeth, Acting Asst. Atty. Gen., Gerald K. Gleason, Asst. Gen. Counsel, Robert A. Weissman, Atty., Environmental Protection Agency, Donald W. Stever, Jr., and Rosanne Mayer, Attys., Dept. of Justice, Washington, D.C., were on brief, for respondent.
 Before WILKEY and WALD, Circuit Judges, and BAZELON, Senior Circuit Judge.
 Opinion for the Court filed by Senior Circuit Judge BAZELON.
 Concurring opinion filed by Circuit Judge WILKEY.
 Dissenting opinion filed by Circuit Judge WALD.
 BAZELON, Senior Circuit Judge:
 
 
 1
 Petitioner General Motors Corporation (GM) brings three consolidated petitions for review of final actions of the Environmental Protection Agency (EPA) under the Clean Air Act, as amended.[1] In these petitions we are asked to decide whether the recall provision of section 207(c)(1) of the Act[2] permits the EPA to require automobile manufacturers to recall and repair at their own expense all members of a class of vehicles--a substantial number of which have been found to be in nonconformity with applicable emissions standards during their useful lives--regardless of the age or mileage of any individual vehicle when presented for repair. We take jurisdiction under section 307(b)(1) of the Act.[3] For reasons detailed below, we reverse the actions of the Administrator.
 
 BACKGROUND
 
 2
 Through the Clean Air Act, Congress sought "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population ...."[4] To this end, Title II of the Act[5] establishes a comprehensive program for the control of motor vehicle emissions. The Act authorizes the Administrator to prescribe standards for motor vehicle emissions within the broad guidelines set out by the statute.[6] Such standards are applicable to the vehicles throughout their "useful lives."[7] The useful life of light duty vehicles, such as automobiles, is defined by statute as "a period of use of five years or fifty thousand miles (or the equivalent), whichever first occurs ...."[8]
 
 
 3
 The Act also provides an elaborate enforcement system designed to ensure that vehicles comply with emissions standards, not only when they leave the assembly line but also while in actual use.[9] Among the enforcement mechanisms at the disposal of the EPA is the authority to order manufacturers to recall and repair at their own expense an entire class or model of vehicles or engines should the Administrator determine that a substantial number of vehicles in that class, although properly used and maintained, have failed to meet applicable emissions standards during their useful lives.[10] The precise scope and application of this recall authority are at issue in this lawsuit.
 
 
 4
 In May 1975, the EPA began an investigation[11] of the emissions performance of 1975 Cadillacs of the 60V43 engine family.[12] On March 21, 1977, following a program of testing fifteen sample vehicles by both EPA and GM, the Administrator officially notified GM that he had determined that a substantial number of 1975 Cadillacs equipped with the 230-carburetor, although properly maintained and used, failed to meet federal emissions standards during their useful lives.[13] The Administrator ordered GM to submit a plan for the recall and repair of the 230-carburetor class.[14] He also indicated that the EPA staff would continue its investigation of emissions problems in 193-carburetor Cadillacs and urged GM to recall these vehicles voluntarily.[15]
 
 
 5
 GM did not contest the finding of nonconformity and "volunteered" to recall the 193-carburetor vehicles.[16] Nevertheless, negotiations concerning GM's proposed remedial plan[17] dragged on from May 1977 until December 1979.[18] Finally, on December 26, 1979, EPA withdrew one of its principal objections and agreed to approve a modified plan that had been submitted by GM on February 15, 1978.[19]
 
 
 6
 At this point, however, GM informed the EPA that "[a]bout forty percent of the subject vehicles are beyond five years old and many more will have accumulated more than 50,000 miles."[20] GM urged the Administrator to cancel the recall and averred that, if the EPA were to go forward with the recall, "only those vehicles within the lesser of five years or 50,000 miles of operation at the time of presentation to the dealer for repairs will receive the campaign adjustments at General Motors (sic ) expense."[21] EPA responded on May 30, 1980 by promulgating what it labelled an "interpretive rule"[22] setting out the EPA's position that the Clean Air Act requires "manufacturers to submit a plan to remedy all vehicles within the class or category of vehicles subject to an ordered recall which experienced the nonconformity during their useful lives regardless of their age or mileage at the time of repair."[23] Shortly thereafter, the EPA wrote to GM, refusing to withdraw the recall order.[24] The EPA letter formally approved GM's remedial plan of February 15, 1978 insofar as it applied to vehicles still within their useful lives at the time of repair.[25] But, relying on the May 30 rule, the agency disapproved the plan insofar as it related to vehicles beyond their useful lives.[26] The letter also reflected EPA's finding that, at least with respect to vehicles beyond their useful lives, GM had "failed to submit a [remedial] plan as required by section 207(c)(1) of the Act...."[27] GM petitioned this court, seeking review of both the May 30 rule and EPA's partial disapproval of GM's remedial plan.[28]
 
 ANALYSIS
 A. Standard of Review
 
 7
 We begin by noting that we are called upon in this case to review an interpretative, not a legislative, rule. While this observation may seem apparent, the nature of the May 30 rule has been hotly contested by the parties. Although EPA has from the start characterized the rule as "interpretive,"[29] GM argues that, because the rule substantially expands the scope of a manufacturer's liability under the recall provisions of the Act, the rule should be viewed instead as an improperly promulgated legislative rule.[30]
 
 
 8
 Where, as here, an agency has the authority to issue both legislative and interpretative rules,[31] the line between the two is often blurred.[32] Nevertheless, the determining factor is the agency's authority and intent in promulgating the rule.[33] Although an agency's own labelling of a rule is not dispositive of the question of intent,[34] it is indicative and is entitled to judicial deference.[35] There is nothing in this record to suggest that EPA ever intended this rule to carry any weight beyond that ordinarily attending an agency's interpretation of a statute.[36]
 
 
 9
 The Supreme Court has pointed out that "[o]rdinarily, administrative interpretations are given important but not controlling significance."[37] The precise weight to be accorded an interpretative rule "in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."[38] The EPA rule does not receive "high marks when judged by [these] standards ...."[39] The rule was not a contemporaneous interpretation of the Clean Air Act, and there is no evidence that it reflects a longstanding interpretation of the Act by the agency.[40] Nor does the rule involve the kind of fact-intensive questions concerning which great deference need be given the agency's technical expertise; rather, as the agency itself concedes, "[s]ince the rule simply expresses an interpretation of the law based on the language, legislative history and policy of the Clean Air Act, no factual data need be analyzed or commented on."[41] Consequently, although some deference is to be accorded to the May 30 rule, our inquiry will focus on whether EPA's interpretation is reasonable and supportable in light of the statutory language and legislative history.[42]
 
 B. Statutory Language
 
 10
 In reviewing an agency's interpretation of a statute, a court should first examine the language of that statute to determine whether the interpretation falls within the statute's plain meaning.[43] In the instant case, however, the statutory language is ambiguous at best. Section 207(c)(1) of the Act provides in relevant part:
 
 
 11
 If the Administrator determines that a substantial number of any class or category of vehicles or engines, although properly maintained and used, do not conform to ... [emissions standards], when in actual use throughout their useful life ..., he shall immediately notify the manufacturer thereof of such nonconformity, and he shall require the manufacturer to submit a plan for remedying the nonconformity of the vehicles or engines with respect to which such notification is given. The plan shall provide that the nonconformity of any such vehicles or engines which are properly used and maintained will be remedied at the expense of the manufacturer.[44]
 
 
 12
 EPA construes the requirements of the entire section as "class-based." Under the agency's interpretation, once the Administrator determines that a substantial number of vehicles in the class fail to conform to standards during their useful lives, the manufacturer is notified of the nonconformity of the class. The manufacturer must then submit a remedial plan for the entire class of vehicles, providing for the repair at the manufacturer's expense of all vehicles or engines that are members of the class. The only exception is for vehicles that have not been properly used and maintained. Indeed, the very existence of this exception for improperly used and maintained vehicles is said to highlight the absence of an explicit exclusion of vehicles beyond their useful lives.[45]
 
 
 13
 GM focuses instead on the concept of nonconformity. Although the manufacturer is notified of the nonconformity of the class of vehicles on the basis of the failure of a substantial number of its members to conform to standards during their useful lives, the remedial plan must address the nonconformity of the individual vehicles in the class, and it is the nonconformity of such vehicles that is to be remedied at manufacturer expense. However,
 
 
 14
 "[n]onconformity" is a word having meaning only for vehicles for which the Act and EPA regulations set emissions standards. The Act does not set nor does it authorize EPA to prescribe emissions standards for any vehicle which has exceeded its 5 years/50,000 miles "useful life". A vehicle which has passed that limit cannot be in "nonconformity" with any emissions standard and, therefore, the law cannot require that any "remedy" be provided for a nonexistent nonconformity.[46]
 
 
 15
 GM's viewpoint is not without merit. Classes of vehicles can be recalled, and remedial plans can be prepared, on a classwide basis. Yet the actual remedy of the nonconformity of a class of vehicles can only be accomplished by the repair of individual vehicles. The repair of a vehicle presupposes the existence of a defect or nonconformity in that vehicle, but a vehicle cannot fail to conform to a standard which does not apply to it. Thus, vehicles beyond their useful lives have no nonconformity to be remedied. Indeed, their "repair" does not even contribute to the remedy of the nonconformity of the class, since vehicles beyond their useful lives are no longer part of the nonconforming class.[47]
 
 
 16
 EPA attempts to circumvent this reasoning by conceding that the manufacturer is not required to repair vehicles which first exceed standards after five years or 50,000 miles.[48] Moreover, "for those vehicles [beyond their useful lives] which are subject to repair at manufacturer expense, the manufacturer is only responsible to carry out the remedy contained in the approved plan and is not responsible to remedy any other nonconformities."[49] However, these concessions appear to generate more problems than they resolve.
 
 
 17
 First, EPA's interpretation relies upon the assumption that, because a "substantial number" of cars are found to exceed vehicle emissions standards during their useful lives, the entire class of cars of that engine-family and model-year is suspect and ought to be subject to recall. The function of this class-based analysis is to shift the focus of attention away from the time-consuming and expensive task of establishing the nonconformity of each individual vehicle so that those resources may be devoted to remedying the nonconformity of the class as a whole. Yet EPA's exception with respect to vehicles first exceeding standards after the expiration of their useful lives undermines its own class-based inquiry.[50] Instead, the EPA invites manufacturers to indulge in fact-specific controversies concerning whether a given car, beyond its useful life when presented for repair, experienced nonconformity during its useful life or first exhibited excessive emissions after its useful life had expired.
 
 
 18
 EPA's concession not only erodes its own class-based theory, but also offers little relief to manufacturers in practice. If the car is not presented for repair until it has exceeded its useful life, how will the timing of the onset of excessive emissions be established? On whom will the burden of proof rest? This difficulty of proof is compounded by the manner in which the recall system operates. The presumption of class nonconformity is based on testing of a relatively small sample of cars.[51] On the basis of such sampling, an estimate of the percentage of cars in nonconformity is made; this percentage will often be substantially less than one hundred percent. In this case, the EPA originally estimated that forty-three percent of the class would exceed standards;[52] this estimate was later increased to sixty-eight percent.[53]
 
 
 19
 Thus, on the basis of the statistical evidence in this case, it would appear that between thirty-two and fifty-seven percent of the cars in this class--whether or not they have exceeded their useful lives at the time that notice of class nonconformity was given or at the time of repair--are likely to have been in compliance with the applicable emissions standards throughout their useful lives.[54] In the case of cars still in their useful lives, the manufacturer may establish, through testing once the cars have been recalled, that a particular car is in compliance and, therefore, no repair would be necessary for that car. Under the EPA's interpretation, however, such a showing may be impossible with respect to cars that have exceeded their useful lives when presented for repair. Congress clearly has contemplated some increase in a car's emissions once the vehicle has surpassed its useful life.[55] However, when a car brought in for repair has exceeded its useful life, the manufacturer will be unable to demonstrate whether a present emissions excess is attributable to this sanctioned erosion in performance or to a nonconformity existing during the vehicle's useful life. In essence, the May 30 rule establishes an absolute and irrebuttable presumption that all older cars were among the percentage failing to meet standards during their useful lives. The establishment of such a presumption might be within the agency's authority, but it goes well beyond simple statutory interpretation.
 
 
 20
 The agency's answer to the problem posed by requiring cars to be brought into conformity with a standard which no longer applies to them is equally disingenuous. The agency explains that manufacturers would not be required to bring cars beyond their useful lives when presented for repair up to the same standards applicable to "younger" cars. Instead, the manufacturer would only be required to perform the same repair on older cars as is mandated for younger vehicles by the remedial plan.
 
 
 21
 This response is not entirely forthcoming. In this case, the repair required under the remedial plan involves adjustment of the idle screw and the adjustable part throttle plug to a specified RPM drop.[56] Thus, under the precise facts of this case, there is a difference between requiring the "same repair" to be made on all cars and requiring all vehicles, regardless of age or mileage, to be brought into conformity with emissions standards. However, in other recall situations the required repair is to bring the car to a particular emissions ratio. In a recent Chrysler recall, for example, the remedy required a mechanic to attach an exhaust emissions analyzer to the catalyst tap and then to adjust the mixture screws back and forth until the idle carbon monoxide concentration met specifications.[57] In cases in which the required repair is not a "fixed" adjustment but rather a "fine-tuning" process, the effectiveness of which is measured by conformity to emissions standards, a blanket rule disregarding the age of the car when presented for repair in effect requires the manufacturer to make an older car meet standards that Congress intentionally required only younger cars to meet. By imposing such a requirement, the EPA rule again exceeds the limits of permissible statutory interpretation.[58]
 
 
 22
 Even if every recall involved remedies in which the "repair" could be performed on older vehicles without their having to be brought into compliance with standards no longer applicable to them, the EPA rule would nevertheless be an unreasonable interpretation of the statutory mandate. If the "repair" does not bring the vehicle on which it is performed back into compliance with emissions standards, it is not a "repair" at all. In essence, the EPA rule requires a manipulation to be performed on older vehicles at manufacturer expense. But, by the EPA's own admission, that manipulation would not remedy a nonconformity as the statutory language clearly contemplates.
 
 C. Legislative History
 
 23
 Whatever doubt may remain concerning the legitimacy of the EPA's interpretation is laid to rest by a critical passage of the Act's legislative history.[59] The passage refers to a Senate version of the bill that at that time established a 50,000-mile, but no age, limitation on vehicle useful life. In discussing the recall provisions of the bill, the Senate Committee said:
 
 
 24
 The 50,000-mile period can be assumed to be 4 to 5 years and the manufacturer should be expected to notify any owner of a vehicle that is five years old or less as to failure to continue to perform to the standard. A decision not to require the manufacturer to repair the vehicle could be made after notice and after finding that the vehicle had exceeded the 50,000-mile warranty period.[60]
 
 
 25
 This language indicates the understanding of Congress that manufacturers would not be required even to notify owners of cars that had in all probability exceeded their useful lives; i.e., cars ostensibly belonging to the nonconforming class but more than five years of age at the time the manufacturer was informed by the EPA of the nonconformity would not be recalled in the first instance. Furthermore, if a car less than five years of age were recalled but found to have exceeded the 50,000-mile limitation when presented for repair, the manufacturer could be excused from liability for repair.
 
 
 26
 EPA attempts to downplay this evidence of congressional intent with two responses. First, EPA contends that the legislative history of the Senate bill is irrelevant[61] because the bill had a "fast track" recall system absent in the Act as finally adopted. Under this scheme, there would have been no allowance for protracted negotiation of the specifics of the recall plan and, hence, no opportunity for the sorts of administrative or manufacturer-induced delays that would permit large numbers of vehicles to exceed their useful lives after their nonconformity had come to the attention of the EPA. Instead, all cars would have had to have been recalled within sixty days of the date that notice of nonconformity was given by EPA to the manufacturer.[62] As a result, EPA argues, "it is clear that the Senate may not have focused upon the problems caused by delays in the implementation of a recall, because substantial delays were impossible under the Senate scheme."[63]
 
 
 27
 EPA's argument fails to persuade for several reasons. First, the so-called "fast track" recall system precludes only one kind of delay--that caused by negotiations over the content of the recall plans. But EPA itself concedes that most of the delay encountered in previous recalls has not derived from protracted negotiations.[64] Months may be consumed in testing and investigating a potentially nonconforming class prior to the issuance of a recall order.[65] Considerable delay may occur while administrative and judicial appeals are exhausted.[66] Yet although the "fast track" recall system would have limited the length of negotiations over remedial plans, the system would have done nothing to avoid the more substantial delays incurred in the course of investigation or appellate proceedings.[67]
 
 
 28
 Moreover, even if the "fast track" system were able to eliminate all delays encountered under the Act, this fact does not render the legislative history of the bill entirely inapposite. Perhaps the significance of the Committee Report's language[68] concerning the fate of vehicles found to be beyond their useful lives when presented for repair might be lessened. Yet, the absence of a possibility for manufacturer-induced delay does nothing to mitigate the weight of the report as evidence that Congress did not intend manufacturers to be responsible for the recall of vehicles likely to have exceeded their useful lives at the time the EPA notifies the manufacturer of nonconformity. Even if there were no delay between EPA notice of nonconformity and manufacturer notification of vehicle owners, cars already beyond their useful lives would not be subject to recall by the terms of the report's language.[69] Yet the May 30 rule would require manufacturers to recall such vehicles.
 
 
 29
 Indeed, the most that can be said for the import of the "fast track" recall system in the Senate bill is that it indicates the possibility that Congress failed to appreciate and to provide relief for the delays that might arise in the recall process when the "fast track" system was removed. However, if the agency wishes to fill in interstices created by a possible congressional failure to anticipate the consequences of amendments to the statutory scheme, the proper recourse is a legislative, not an interpretative, rule.[70] An interpretative rule may neither expand nor contract the statutory form and substance;[71] it must simply construe, without supplementing, the terms of the Act.[72]
 
 
 30
 EPA also argues that any inference to be drawn from the language of the Committee Report concerning the manufacturer's duty to notify and to repair vehicles exceeding their useful lives must be counterbalanced by other segments of the legislative history evidencing Congress' concern that the industry produce cars capable of meeting emissions standards throughout their actual lives.[73] For example, Senator Muskie, one of the bill's sponsors, remarked:
 
 
 31
 Throughout discussions with the industry over the past 6 or 7 years, that is what they were stating, 50,000 miles. They do not consider that technology would be effective or worthwhile, in terms of cost to the consumer, unless it meets the 50,000-mile test. So we are asking for that, because unless automobiles will perform for a practical proportion of their life, meeting standards initially may not be worthwhile. Fifty thousand miles is not all their life, 100,000 miles being nearer to a measure of the life of a motor vehicle, but we have taken 50,000 miles, ... and we have used that 50,000-mile test on performance.[74]
 
 The Committee Report also observed:
 
 32
 The [Senate] Committee hopes that, if the motorist complied with [the manufacturer's maintenance] instructions, emission controls would not deteriorate after 50,000 miles to the extent that ambient air quality would be impaired. The Committee further expects the manufacturer to endeavor to either improve the quality control of emission systems or explore better ways to assure compliance beyond 50,000 miles of use.[75]
 
 
 33
 EPA's reliance on these passages of the legislative history is misplaced. Neither GM nor this court have any doubt that Congress believed that the actual life of an automobile is closer to ten years and one hundred thousand miles than it is to five years and fifty thousand miles. Nor do we doubt that Congress hoped that, by rigidly enforcing emissions standards during the five-year/fifty thousand-mile statutory useful life, emissions performance would be improved throughout the balance of the car's actual life. Nevertheless, Congress intentionally limited the duration of a manufacturer's liability for a vehicle's conformity to standards to a five-year/fifty thousand-mile period in response to industry representations that the technology could not be guaranteed for a longer period.[76] It is not for the agency to impose under the guise of "interpretation" a more stringent requirement that Congress considered and rejected.
 
 CONCLUSION
 
 34
 We are not insensitive to the fact that our holding may impede the enforcement of emissions standards even for cars within their useful lives at the time the EPA first notifies the manufacturer of the nonconformity of a vehicle or engine class. Nonconformity may be discovered only late in a vehicle's useful life,[77] and only an unusually uninventive lawyer will be unable in the context of today's backlogged court dockets to prolong administrative and judicial appeals for at least several years. The recall system may be rendered useless if the combination of belated identification of nonconformities and protracted negotiations and appeals combine to place all or most vehicles involved in a recall beyond their useful lives once owner notification commences.[78]
 
 
 35
 However, this is a difficulty which can only be redressed by congressional intervention, or at a minimum, legislative rulemaking with attendant notice and comment procedures.[79] "It is not for an administrative agency ... to preempt Congressional action or to 'fill in' where it believes some federal action is needed."[80] Although the May 30 rule may have been a well-intentioned response to an obvious and precipitous loophole in the statutory framework, the rule, and as a result the GM recall order, exceeded the bounds of reasonable statutory interpretation. Therefore, we vacate both the May 30 rule and that part of the June 23, 1980 order that found that GM had failed to submit a remedial plan with respect to 1975 Cadillacs beyond their useful lives when presented for repair.[81]
 
 
 36
 So ordered.
 
 WILKEY, Circuit Judge, concurring:
 
 37
 I concur in Judge Bazelon's opinion for the court. The issue posed to us is one of statutory interpretation, not factual assessment or policy judgment. We are agreed that EPA interpreted the statute erroneously, and that General Motors' interpretation is likewise wrong. The court, however, should not be secretive; we should go forward and give our interpretation of the statute instead of sending the question back to the agency to make another guess.
 
 
 38
 At the outset it may be helpful to list the possible alternative positions. The question is how the class of cars to be recalled and repaired is to be described and defined. Four interpretations of the statute appear to be possible. If X, Y, Z, and A represent certain quanta of cars, then:
 
 
 39
 1. X = the number of cars which have not passed their useful life on the date when EPA sends its notice to the manufacturer.
 
 
 40
 2. X minus Y = the number of cars on the date when the manufacturer sends notice to the car owners.
 
 
 41
 3. X minus Y minus Z = the number of cars on the date when the individual car is presented at the shop in accordance with the recall notice.
 
 
 42
 4. X plus A = all of the class of cars defined in the EPA recall notice, irrespective of whether they have passed their useful life at the time they are presented for repair.
 
 
 43
 The last category, X plus A, represents all the possible cars in the class, and is EPA's position, which is rejected by the court. X minus Y minus Z represents General Motors' position, i.e., the recall and repair obligation only attaches to a car which, when presented at the shop, has not exceeded its useful life. This argument is rejected by the court.
 
 
 44
 X, the number of cars which have not exceeded their useful life at the time the EPA sends notice of its decision to the manufacturer, represents what I think is the proper interpretation of the statute.
 
 
 45
 Section 207(c) of the Clean Air Act reads in relevant part as follows:
 
 
 46
 If the Administrator determines that a substantial number of any class or category of vehicles or engines, although properly maintained and used do not conform to the regulations prescribed under section 7521 of this title, when in actual use throughout their useful life ... he shall immediately notify the manufacturer thereof of such nonconformity, and he shall require the manufacturer to submit a plan for remedying the nonconformity of the vehicles or engines with respect to which such notification is given. The plan shall provide that the nonconformity of any such vehicles or engines which are properly used and maintained will be remedied at the expense of the manufacturer.[1]
 
 
 47
 A proper interpretation of this passage requires us to work backward from the last sentence. The remedial plan must provide for the repair of "any such vehicles or engines." "[S]uch vehicles or engines" refers us to the last clause of the previous sentence: "the vehicles or engines with respect to which such notification is given." By simple substitution we see that the remedial plan must provide for the repair of any vehicles or engines with respect to which notification of nonconformity is given.
 
 
 48
 There can be no "nonconformity" by automobiles which, at the time of the EPA notice, have passed their useful life. As the court's opinion makes clear, there are no emission standards for cars beyond their useful life. Congress defined useful life as 50,000 miles or five years, whichever comes first. Therefore, there can be no nonconformity with emissions standards for an automobile which has passed either of these milestones, for there are no standards with which to conform. Notification of nonconformity can only be given to manufacturers with regard to cars which are obligated to conform to emission standards, i.e., those cars which have not passed either 50,000 miles or five years.
 
 
 49
 When the EPA orders relief to be provided, every car owner who at that moment is entitled to relief ought always to be entitled to it. The right of an owner to have his car corrected should not be lost simply because of delays either by the manufacturer or, more likely, by the agency itself in working out a remedial plan--as occurred in this case.
 
 
 50
 This interpretation of the statute would, of course, impose some obligations on manufacturers to repair cars that have passed their useful life by the time they are presented for repair. It is, however, perfectly logical to require that an administrative determination of "nonconformity" be made only for those cars that are within their statutorily defined useful life at the time of the agency's notice action, and yet to insist that once the agency makes the determination and gives notice, the manufacturer's obligation to repair those particular vehicles is unaffected by a subsequent passage of time or an increase in mileage.[2]
 
 
 51
 The practical question of determining whether a car presented for repair work was within its useful life on the date of the EPA notice, even though on the date of presentation to the shop it may be over 50,000 miles or five years, is simple enough. The age of the car on the date of the EPA notice can be determined by looking at the car's bill of sale. To determine the car's mileage on the date of the EPA notice, the agency can employ a simple rule that a car's mileage is presumed to increase uniformly throughout its period of ownership. It then becomes a high school mathematical problem to affix the mileage of the car on the date of the EPA notice of recall.
 
 
 52
 This interpretation of the statute is supported by the rather complex legislative history, which I do not think we need to pursue here.[3] The face of this portion of the statute gives us a reasonable interpretation, for which the implementation[4] is as simple as I have outlined.[5]
 
 WALD, Circuit Judge, dissenting:
 
 53
 The panel's decision today invalidates an interpretative rule of the EPA that finds no contradiction, and indeed much support, in the language, purpose, and legislative history of the Clean Air Act Amendments of 1970. In so doing, it oversteps appropriate bounds for judicial interference with reasonable statutory interpretation by an enforcement agency. Disturbingly, it permits automobile manufacturers to circumvent in large part or even altogether section 207's recall and repair obligations through a strategy of engaging in prolonged litigation.
 
 
 54
 To repeat a frequent incantation of this court, "[i]t is the settled rule that the practical interpretation of an ambiguous or doubtful statute that has been acted upon by officials charged with its administration will not be disturbed except for weighty reasons." Chrysler Corp. v. EPA, 631 F.2d 865, 884 (D.C.Cir.) (quoting Brewster v. Gage, 280 U.S. 327, 336, 50 S.Ct. 115, 117, 74 L.Ed. 457 (1930)), cert. denied, 449 U.S. 1021, 101 S.Ct. 589, 66 L.Ed.2d 483 (1980). The majority opinion itself refers to the statutory language of section 207 as "ambiguous," and the EPA's interpretation in this case is an eminently "practical" one. Indeed, this court recently reviewed an EPA interpretation of the section 207 recall authority and observed that "[a]lthough this court has the duty ... to 'decide all relevant questions of law,' we recognize that the special expertise of the EPA in interpreting the legislation which it is called upon to administer requires that we defer to the judgment of the Agency when that judgment is reasonable and is consistent with the language and purpose of the legislation." Id. (quoting the Administrative Procedure Act, 5 U.S.C. Sec. 706). Therefore, in the absence of contradictory statutory language or a reasonably clear "contrary indication in the legislative history," Whirlpool Corp. v. Marshall, 445 U.S. 1, 13, 100 S.Ct. 883, 891, 63 L.Ed.2d 154 (1980), an interpretative rule that "on its face appears to further the overriding purpose of the Act, and rationally to complement its remedial scheme," id., must be upheld.[1] I can find no legitimate reason for avoiding that mandate here.
 
 
 55
 THE PANEL BY ITS OWN ADMISSION EFFECTIVELY GUTS SECTION 207
 
 
 56
 The Clean Air Act's unequivocal purpose is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. Sec. 7401(b)(1). The EPA rule struck down by the majority obviously effectuates this purpose. When the EPA discovers a defect in a class of cars that results in excessive pollution during their useful lives, the rule assures that the manufacturer must fashion a remedy to fit the violation: the remedial plan must include "all properly used and maintained nonconforming vehicles in the subject class regardless of their age or mileage at the time of repair." 45 Fed.Reg. 36,39 6, 36,397 (May 30, 1980).
 
 
 57
 This interpretation makes good practical sense because whatever their age at the time of the actual recall, nonconforming cars have been riding the roads for years in violation of pollution standards. Cars that are nonconforming during their useful lives do not cease to be a pollution hazard thereafter; in fact, it is sensible to presume that they are more likely afterward to be a hazard than conforming cars. To the degree they can be altered to decrease their pollution potential even after their useful lives, the public is benefitted. By the same token, to the degree they elude correction both during and after their useful lives, the public is cheated.[2]
 
 
 58
 Indeed, the majority candidly admits that its invalidation of the rule may "render[ ] useless" the EPA recall system. Maj.Op. at 997. In the majority's words, "only an unusually uninventive lawyer will be unable in the context of today's backlogged court dockets to prolong administrative and judicial appeals for at least several years," with the result that "all or most vehicles involved in a recall" will be exempted from the repair obligation.[3] Id. Certainly, a statutory construction which acknowledgedly produces such a bizarre result should be viewed with great skepticism. Only recently we stressed, "[w]e cannot interpret section 207 'in a manner which runs counter to the broad goals which Congress intended it to effectuate.' " Chrysler Corp. v. EPA, 631 F.2d at 888 (quoting FTC v. Fred Meyer, Inc., 390 U.S. 341, 349, 88 S.Ct. 904, 908, 19 L.Ed.2d 1222 (1968)). The panel has done so here.[4]
 
 
 59
 THE PANEL OPINION IS NOT CONSISTENT WITH THE LANGUAGE,
 
 HISTORY, OR PAST INTERPRETATION OF SECTION 207
 
 60
 The language of section 207 offers no firm ground for invalidating the EPA interpretative rule. The statute requires manufacturers to submit remedial plans for "vehicles or engines with respect to which ... notification is given," and directs the EPA Administrator to give such notification regarding a "class or category of vehicles or engines," a substantial number of which exhibited nonconformity during their useful lives. 42 U.S.C. Sec. 7541(c)(1). Thus, EPA reasonably interpreted the statute to require the manufacturers to include a car in their remedial plans if (1) a substantial number of cars exhibit nonconformity during their useful lives, and (2) the car is a member of that class. In this case, an estimated 68% of the automobiles in the class were exceeding emission standards during their lifetimes.
 
 
 61
 EPA's class-based interpretation of section 207 enjoys precedential support. This court, in one of the few judicial cases to construe the recall provision, observed that "[u]nlike the discovery and cure of nonconformity of individual vehicles under the warranty provisions, the remedy at this stage is recall of the entire class of vehicles in order to correct the design, material, or workmanship defect ...." Chrysler Corp. v. EPA, 631 F.2d at 868 (emphasis in original). Moreover, the remedial plans approved by EPA in the past have uniformly extended to all vehicles or engines in the recall class.[5]
 
 
 62
 The legislative history similarly supports EPA's interpretative rule. The Report of the Senate Public Works Committee--upon which the majority heavily relies--refers to the recall of an entire "model or class" of vehicles or engines. S.Rep. No. 1196, 91st Cong., 2d Sess. 29 (1970). The Senate Committee bill designed two methods for EPA to assure in-use compliance with emission standards. First, after the development of a "quick test" method, the EPA could test the continuing compliance of "individual vehicles on the road." Id. Alternatively, the EPA could conduct more intensive examinations of "representative sample[s] of a model or class," and, after a finding of classwide noncompliance, EPA "could require the manufacturer to recall that model or class ...." Id.; see id. at 111 (language of S. 4358 Sec. 207) (If EPA finds that "statistically representative samples of any class or category of vehicles or vehicle engines ... do not conform," then all "vehicle engines included within the class or category" should be notified); id. at 62-63 (section-by-section analysis) after the EPA "discovers defects through testing" of a class of vehicles or engines, it "shall order the manufacturer to notify ... purchasers of the defect") (emphasis added).[6]
 
 
 63
 Furthermore, when Congress revisited section 207(c) in 1977, the discussion assumed that the recall provision extended to all member vehicles or engines of the non-conforming classes. See, e.g., H.Rep. No. 294, 95th Cong., 1st Sess. 497 ("if a substantial number of systems fail during their on-the-road operation, the EPA can recall the entire lot for repair at the manufacturer's expense"); id. at 498 (noting the possibility of "a recall of all of that model vehicle or engine type"); 6 Environmental Policy Division of the Congressional Research Service of the Library of Congress for the Comm. on Environment and Public Works, 95th Cong., 2d Sess. 4540 (1978) (preliminary statement of Sen. Bentsen) ("section 207(c) authorizes the Agency to require the automaker to recall a given model run for needed repairs if the Agency determines that a substantial number of that model or engine type do not conform to the standards when in actual use") (emphasis added); id. at 1220 (preliminary statement of Sen. Riegle) ("If a substantial number of systems fail during their on-the-road operation, the EPA can recall the entire lot for repair at the manufacturer's expense"). Given these indicia of the congressional understanding of section 207(c), and the contemporaneous administrative policy (as evidenced by manufacturers' remedial plans, see supra at 1002), it is reasonable to assume that Congress reaffirmed the EPA's understanding of its recall authority when it revisited and ratified the recall provision in 1977. There is not a shred of evidence to the contrary.
 
 
 64
 The majority, nonetheless, believes it has found a stunning piece of legislative history that "la[ys] to rest" any doubt that the Congress intended to exclude from the recall remedy cars that "have exceeded the 50,000-mile limitation when presented for repair ...." Maj.Op. at 992 - 993. The full passage reads:
 
 
 65
 The Committee also recognizes the difficulty in any recall provision of notifying the owners of vehicles. The burden would be placed on the manufacturer to notify both the initial and subsequent purchasers of vehicles. The Committee expects that the manufacturer would not only depend on the files of the franchise dealer, but would, to the extent practicable, use State motor vehicle department registration files to obtain the names and addresses of subsequent purchasers of cars. By establishing a 50,000 mile, no year lifetime for the purpose of warranty, the Committee did not intend to relieve the automobile manufacturers of their responsibility to notify owners of older cars. The 50,000-mile period can be assumed to be 4 to 5 years and the manufacturer should be expected to notify any owner of a vehicle that is five years old or less as to failure to continue to perform to the standard. A decision not to require the manufacturer to repair the vehicle could be made after notice and after finding that the vehicle had exceeded the 50,000-mile warranty period.
 
 
 66
 S.Rep. No. 1196, supra, at 31. As the majority notes, the report deals with an earlier and different version of section 207 from the one ultimately enacted. The pertinent section of the Senate bill then being considered by the Committee defined "useful life" solely in terms of the 50,000 mileage limit (unlike the final act, it imposed no five year limit). Maj.Op. at 992; see S.Rep. No. 1196, supra, at 110 (section 207(c) of S. 4358). The majority overlooks, however, another much more significant difference between the Senate bill and the final enactment.
 
 
 67
 The Senate bill did not provide for any recall repair to correct noncompliance with emission standards; it provided only for the warranty repair obligation. Section 207(d)(2) of the bill merely directed the EPA to "order the manufacturer to provide prompt notification ... [to] purchasers of all ... vehicles or vehicle engines included in the class or category" that the EPA, through testing of "statistically representative samples," had found to be out of compliance with the emission standards. S.Rep. No. 1196, supra, at 111. Once the purchaser received such a notice, he could have sought repair at the manufacturer's expense under the warranty that was mandated by section 207(c) of the bill. See id. at 110. In the final enactment, by contrast, the recall provision includes an independent remedial obligation: a class of cars, discovered by EPA testing to be out of compliance, must "be remedied at the expense of the manufacturer." 42 U.S.C. Sec. 7541(c)(1). This obligation arises out of the manufacturer's separate duty in a recall to formulate and follow an adequate remedial plan. Id. This obligation does not arise out of the warranty requirements, under which a manufacturer must guarantee the design and performance of the emission control systems. See id. Sec. 7541(a)(1).
 
 
 68
 The passage from the Senate Report, relied upon so heavily by the panel, must therefore be read in conjunction with the more limited recall provisions in the bill then under consideration. In that context, the passage deals primarily with the difficulty placed on the manufacturers by section 207(d) of the bill--the "recall" section that requires manufacturers merely to notify purchasers of a class of vehicles or engines. As to that notice, the report says only that "[b]y establishing a 50,000 mile, no year lifetime for the purpose of warranty, the Committee did not intend to relieve the automobile manufacturers of their responsibility to notify owners of older cars." S.Rep. No. 1196, supra, at 31. The meaning of this delphic sentence may never be entirely clear, but a reasonable interpretation is this. The 50,000 mile lifetime provision, of course, was found in the warranty section of the bill. See id. at 110 (section 207(c) of S. 4358). The sentence, therefore, was intended to make clear that "recall" notices, to the greatest extent practicable, should be sent to all owners of vehicles or engines in the test class that might conceivably have been eligible for repair under the warranty provision. The final sentence in the passage made clear that the "recall" notice did not automatically entitle its bearer to repair at the manufacturer's expense. Because the warranty obligation ended when the vehicle exceeded 50,000 miles, the manufacturer would not have been required to repair a car that had exceeded the warranty mileage, even though it was a member of the "recall" class.
 
 
 69
 At the same time, the Committee recognized that the notice requirement could have created practical difficulties for manufacturers in locating the buyers of older cars, which might have traded hands numerous times.[7] The Committee Report accordingly suggests that manufacturers consult "[s]tate motor vehicle department registration files" as well as their own "files of franchise dealer[s]" in order to "obtain the names and addresses of subsequent purchasers of cars." Moreover, because under the Senate bill the "recall" notice functioned merely to alert consumers that they could assert their warranty rights against the manufacturer, such notice served no purpose if the consumer owned a car that had exceeded its useful life. In such cases, the warranty repair obligation--the consumer's sole recourse under the bill--ended once the car travelled 50,000 miles. The Committee, apparently in acknowledgment of the practical difficulty of providing notice to owners of older cars, and in recognition of the pointlessness of requiring notice to owners of cars that had in all likelihood passed their useful lives, stated that "[t]he 50,000-mile period can be assumed to be 4 to 5 years and the manufacturer should be expected to notify any owner of a vehicle that is five years old or less ...." This sentence is, of course, irrelevant to the statute as enacted, because Congress later added both the five-year age limit to the definition of "useful life" and added a recall repair obligation independent of the warranty terms.
 
 
 70
 Indeed, the fundamental thing about the passage from the Senate Report is its total irrelevancy to the present Act. For the law as enacted, in contrast to the Senate bill,[8] imposes an independent recall repair obligation in addition to the warranty obligation. Section 7541 of Title 42 requires the manufacturer of a recalled class to submit and comply with a remedial plan for that class. Unlike the warranty repair obligation, the recall repair obligation extends to all member vehicles or engines in the recall class, and is not limited by the age of the vehicle or engine at the time of repair. Thus, the passage explains an earlier version of section 207 that limited the manufacturer's repair responsibilities to those arising out of a warranty covering cars within their useful lives at the time of repair. It is simply inapplicable to the final version of the Act.[9] The majority's decisive reliance[10] on the passage from the Senate Report is therefore misplaced.
 
 
 71
 In sum, then, I find nothing in the language, history, or purpose of the Act that readily supports the majority's invalidation of the EPA's interpretative rule. I believe it is an eminently reasonable rule, geared to fit the words and the theme of the Clean Air Act Amendments.
 
 
 72
 THE PANEL AND THE CONCURRING OPINIONS ARE INCONSISTENT
 
 INTERNALLY AS WELL AS WITH EACH OTHER AND POSE
 MORE PRACTICAL DIFFICULTIES THAN THE
 RULE THAT THEY STRIKE DOWN
 
 73
 Finally, I do not believe the panel opinion can logically coexist with its own proposed "legislative" rule or with Judge Wilkey's concurring opinion. Toward the end of the majority opinion, Judge Bazelon suggests that a "legislative rulemaking with attendant notice and comment procedures" could redress the "difficulty" arising from the decision that a manufacturer may now avoid recall by protracted litigious strategems. Maj.Op. at 998-. Yet throughout its opinion the majority reiterates its view that the drafters of section 207 intended that vehicles and engines beyond their useful lives at the time of repair need not be remedied by the manufacturers. See, e.g., Maj.Op. at 988-989 ("vehicles beyond their useful lives have no nonconformity to be remedied");[11] id. at 989 ("the EPA invites manufacturers to indulge in fact-specific controversies concerning whether a given car, beyond its useful life when presented for repair, experienced nonconformity during its useful life ....");[12] id. at 991 ("a blanket rule disregarding the age of the car when presented for repair in effect requires the manufacturer to make an older car meet standards that Congress intentionally required only younger cars to meet .... the EPA rule [therefore] exceeds the limits of permissible statutory interpretation").[13] It is therefore difficult to see how the same section could authorize the legislative rule suggested by the majority--to toll the "useful life" of the car at the time of EPA notification of noncompliance--or the "mathematical" rule suggested by Judge Wilkey--to include in remedial plans all cars and engines within their useful lives at the time of the EPA notice. Either one would require the repair of vehicles beyond the age limits set by Congress, and so violate the basic tenets of the panel's rationale.
 
 
 74
 Judge Wilkey's concurrence is equally puzzling. He extends the manufacturer's repair obligations to encompass only those cars within their useful lives at the time the EPA issues a notice of nonconformity. To arrive at this conclusion, he parses section 207(c) "work[ing] backward," and finds that a remedial plan must provide for only "the vehicles or engines with respect to which such notification is given." Conc.Op. at 2. Judge Wilkey, however, stops his backward trek through the statute too soon. Under section 207(c), EPA must give notice with respect to a "class or category of vehicles or engines" found not to conform to emission standards during their useful lives. The statute thus mandates classwide notice without limitation, and requires the manufacturer to repair all cars and engines "with respect to which [such] notice is given." Judge Wilkey nonetheless declares as if by fiat "[t]here can be no 'nonconformity' by automobiles which, at the time of EPA determination and notice have passed their useful lives." Id. In the face of a statute that requires notices of nonconformity to be sent with respect to entire classes of cars--some members of which might already be beyond their useful lives at the time of notice--one may properly wonder: why not? By the same token, the statutory language does not compel Judge Wilkey's notion that "[n]otification of nonconformity can only be given to manufacturers with regard to cars which are obligated to conform to emission standards ...." Conc.Op. at 1000. The statute may fairly be read to require classwide notice, regardless of whether some members of the class have exceeded their useful lives.
 
 
 75
 Moreover, Judge Wilkey's notion that there can be no emission standards for cars beyond their useful life, id., is directly at odds with his proposal that every car "within its useful life on the date of the EPA notice" should be repaired at the manufacturer's expense, no matter what the car's age or mileage at the time of repair, id. Under Judge Wilkey's proposal, many cars exceeding their useful lives at the time the recall is implemented would nevertheless be repaired pursuant to a remedial plan. How and why, under his original notion, should a car to which "no [emission] standards," apply and for which "there can be no nonconformity with emission standards," id. be part of an EPA-mandated remedial plan?
 
 
 76
 Finally, the majority objects to the EPA rule on the ground there is no adequate method to determine whether an overage car was ever in violation of the standards during its useful life. See Maj.Op. at 990 ("If the car is not presented for repair until it has exceeded its useful life, how will the timing of the onset of excessive emissions be established?"). Yet, the panel's legislative rule and the concurrence's "mathematical" rule would both result in the repair of cars and engines exceeding their useful lives without any attempt to establish whether emission standards violations occurred during their useful lives. Both rules suggest to me that Judges Bazelon and Wilkey felt compelled pragmatically to find some escape from the statutory straightjacket in which they had laced themselves.
 
 
 77
 Unfortunately, neither succeeds in providing a principled exception to their basic, and I believe misguided, notion that only individual vehicles within their useful lives at the time the recall is implemented or the notice is given can suffer from a "nonconformity" to be remedied by the manufacturer's plan. Yet, in the absence of such an exception, the majority admits that the recall system will be "rendered useless."[14] Maj.Op. at 997. Like the EPA, I do not submit to the notion that only individual vehicles within their useful lives at the time of recall (or notice) can be "nonconforming" so as to come within the scope of the remedial plan. Congressional enactments should be interpreted to avoid impediments to clear congressional purpose. Section 207 accordingly should be interpreted in a way that can sustain a workable recall system: classes and categories of cars that have exhibited substantial nonconformity during their useful lives should be subject to recall.
 
 
 78
 To sum up, I find nothing in the plain language, nor in the legislative history of the Clean Air Act Amendments to contradict the EPA's reasonable interpretative rule. The EPA rule presents a practical solution to the implementation of the clear congressional purpose of achieving effective automotive emission controls. The majority opinion, by its own admission, seriously detracts from this overarching purpose.[15] Accordingly, I believe the majority, in invalidating the EPA rule, has transgressed the appropriate standards that limit judicial interference with an agency's reasonable actions to effectuate an important national policy.
 
 
 79
 I respectfully but emphatically dissent.
 
 
 
 [1]
 42 U.S.C. Secs. 7401 et seq. (Supp. V 1981) [hereinafter "the Act"]
 
 
 [2]
 42 U.S.C. Sec. 7541(c)(1) (Supp. V 1981)
 
 
 [3]
 42 U.S.C. Sec. 7607(b)(1) (Supp. V 1981)
 
 
 [4]
 Clean Air Act Sec. 101(b)(1), 42 U.S.C. Sec. 7401(b)(1) (Supp. V 1981)
 
 
 [5]
 42 U.S.C. Secs. 7521-7574 (Supp. V 1981)
 
 
 [6]
 Clean Air Amendments of 1970 Sec. 6(a), 84 Stat. 1676, 1690 (1970) (current version at 42 U.S.C. Sec. 7521 (Supp. V 1981))
 
 
 [7]
 Id. Sec. 6(a)(1), 84 Stat. 1676, 1690 (1970) (current version at 42 U.S.C. Sec. 7521(a)(1) (Supp. V 1981))
 
 
 [8]
 Id. Sec. 6(a), 84 Stat. 1676, 1692 (1970) (current version at 42 U.S.C. Sec. 7521(d)(1) (Supp. V 1981))
 
 
 [9]
 Id. Sec. 8(a), 84 Stat. 1676, 1694-98 (1970) (current version at 42 U.S.C. Secs. 7525, 7541 (Supp. V 1981))
 
 
 [10]
 Clean Air Act Sec. 207(c)(1), 42 U.S.C. 7541(c)(1) (Supp. V 1981)
 Other aspects of the enforcement mechanism require presale and assembly line testing and certification, see id. Sec. 206, 42 U.S.C. Sec. 7525 (Supp. V 1981), and warranties for the repair of isolated, individual vehicle failures, see id. Sec. 207(a), (b), 42 U.S.C. Sec. 7541(a), (b) (Supp. V 1981).
 
 
 [11]
 The investigation was initiated in response to data from state emissions inspections and GM assembly line audits indicating significant hydrocarbon and carbon monoxide problems. See Joint Appendix (J.A.) 1
 
 
 [12]
 The 60V43 engine family consisted of approximately 220,000 vehicles equipped with carburetor part number 7045230 or 7045193 [hereinafter referred to as the 230-carburetor or 193-carburetor, respectively]. See EPA Brief at 5 n. 6
 
 
 [13]
 See J.A. 123. This determination was based on EPA ordered testing of 15 sample vehicles, permitting the EPA to project with 95 percent statistical confidence that at least 68 percent of the vehicles in the class were exceeding standards. See id. at 122-23, 125. Earlier projections estimated a 43 percent nonconformity rate. See J.A. 35
 
 
 [14]
 See J.A. 123
 
 
 [15]
 See J.A. 123-24
 
 
 [16]
 See J.A. 126. GM's agreement to recall vehicles equipped with 193-carburetors was not purely altruistic. Although GM continued to contend that the 193-carburetor vehicles complied with emissions standards, there was no practical method of determining which of the carburetors was installed in a given 1975 Cadillac until it had been brought into the repair shop. See id
 
 
 [17]
 A manufacturer notified of a determination of nonconformity is required to submit a remedial plan for the Administrator's approval. See Clean Air Act Sec. 207(c)(1), 42 U.S.C. Sec. 7541(c)(1) (Supp. V 1981); 40 C.F.R. Secs. 85.1803-85.1804 (1982). The manufacturer must demonstrate both that the proposed remedy is technically sound and that it can and will be properly implemented. See 40 C.F.R. Secs. 85.1803-85.1804 (1982)
 
 
 [18]
 See J.A. 137, 142, 145, 170, 182, 203, 224, 226, 230, 236, 247, 252
 Much has been made by both parties of the time lag between initial notification of nonconformity and the EPA's ultimate approval of the remedial plan and of the appropriate allocation of blame for the delay. The EPA maintains that its original refusal to approve GM's proposed remedial plan was premised on two principal concerns. First, GM had failed to demonstrate that the repair proposed for the 193-carburetor would actually remedy the nonconformity in those vehicles. Second, the adjustment's actual or perceived adverse effect on the drivability of the Cadillacs might induce mechanics, fearing customer dissatisfaction, to refuse to perform the repair properly. See J.A. 137-38, 142. GM tested the 193-carburetor vehicles and discovered that its proposed repair did not in fact remedy the nonconformity, yet did not submit a revised remedial plan until January 30, 1978. See J.A. 203. A few minor modifications to this plan were made at the request of the EPA and were incorporated in a new revised remedial plan submitted on February 15, 1978. See J.A. 224. This is the plan that was ultimately approved by the EPA. See J.A. 252-55, 261-64. GM attempts to excuse its delay on the ground that the 193-carburetor recall was voluntary and did not require EPA approval. See GM Reply Brief at 12-13. However, once GM's own testing had revealed that half of the sample of eight vehicles failed to meet carbon monoxide emissions standards and that the repair originally proposed failed to remedy this problem, see J.A. 170, it seems fair to assume that the EPA refrained from ordering a recall of the 193-carburetor class only because the details of the "voluntary" recall were currently being negotiated.
 To alleviate its concerns with respect to mechanics' motivation to perform the repairs properly, EPA proposed, among other measures, that GM conduct a performance audit. See J.A. 142-43. GM agreed to some of the measures but refused to assume responsibility for an audit, arguing both that an audit was unnecessary and that it would place GM in an adversary relationship with its own dealers. See J.A. 203-06. Although EPA continued to insist on its authority to require GM to perform the audit, EPA ultimately dropped its demand that GM conduct the audit and decided instead to conduct an audit itself. See J.A. 254. GM argues that, because EPA's insistence on a GM-conducted audit which "it had no right to demand and which it dropped in the final approval" was the real cause of the delay, see GM Reply Brief at 12, "it is arbitrary and capricious for EPA to assert in 1980 that GM now should repair vehicles which have exceeded their useful lives." GM Brief at 35.
 Because of our disposition of EPA's interpretative rule and order on other grounds, we need not reach the question of EPA's authority to require manufacturers to conduct recall audits nor need we assign to either party full responsibility for the delay that resulted in the vast majority of the vehicles having exceeded their useful lives by the time the recall plan was approved. See J.A. 258, 261 (estimating only 52,000 of the 220,000 vehicles remained within their useful lives at the time of conditional approval of the remedial plan). We do note, however, that the audit issue was not a frivolous question, that it was hotly contested by both parties for some time in what we can presume to have been good faith, and that it is illustrative of the type of controversy that can prolong approval negotiations despite the best intentions and cause the "useful life" problem to arise again in the future.
 
 
 [19]
 See J.A. 252-55. See supra note 18
 
 
 [20]
 J.A. 257
 
 
 [21]
 J.A. 259. GM maintains that this statement, contained in a letter to the EPA dated February 5, 1980, merely reiterated the position GM had first taken in January 1979. See GM Brief at 5. EPA insists that the February 1980 letter "was the first time that GM had proposed to impose a 5/50 limitation on a remedial plan." EPA Brief at 11. Whether there was verbal communication between GM and EPA on this issue before February 1980 we cannot say; there is, however, nothing in the record before this court to document any exchange between GM and EPA concerning the 5-year/50,000-mile limitation prior to the February 1980 letter
 After the February letter, GM imposed but later withdrew 5-year/50,000-mile limitations in several other pending recalls. See EPA Brief at 11 & nn. 17-18. Consequently, the 1975 Cadillac recall is the only situation which to the court's knowledge presently involves a dispute between the EPA and a manufacturer concerning the extent of a manufacturer's liability to recall and repair vehicles beyond their useful lives.
 
 
 [22]
 Section 307(d)(2)-(6) of the Clean Air Act, 42 U.S.C. Sec. 7607(d)(2)-(6) (Supp. V 1981), establishes certain procedural requirements in connection with agency promulgation of rules. The Act requires, inter alia, establishment of a rule-making docket, publication of notice of proposed rulemaking in the Federal Register, a specified period for receipt of public comment, public access to the docket materials, and response by EPA to each significant comment, criticism, and submission of data. Id. However, section 307(d)(1) of the Act provides, in relevant part: "This subsection shall not apply in the case of any rule or circumstance, referred to in subparagraphs (A) or (B) of subsection 553(b) of title 5 [of the United States Code]." 42 U.S.C. Sec. 7607(d)(1) (Supp. V 1981). The relevant provision of title 5 provides in turn that rulemaking procedures need not be applied "to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice ...." 5 U.S.C. Sec. 553(b)(A) (1982). Thus, by casting the regulation as an interpretative rule, the agency was able to circumvent most of the rulemaking requirements of the Clean Air Act. The EPA did create and provide access to a public docket in connection with the promulgation of the May 30 rule (although the utility of even that exercise must be questioned in light of the absence of the public comments that would normally arouse interest in the docket), but none of the other rulemaking procedures were observed. See 45 Fed.Reg. 36,396, 36,397 (May 30, 1980)
 
 
 [23]
 45 Fed.Reg. 36,396, 36,396-97 (May 30, 1980) (presently codified at 40 C.F.R. Sec. 85.1803, app. A to subpart S (1982))
 
 
 [24]
 See J.A. 261-64 (EPA Letter dated June 23, 1980)
 
 
 [25]
 Id. GM agreed to proceed with the recall of these vehicles. See J.A. 308
 
 
 [26]
 See J.A. 261-64
 
 
 [27]
 J.A. 263. The Administrator warned GM that "[t]he failure to submit a plan for these vehicles is considered to be a separate offense under sections 203(a)(4)(B) and 205 of the Act for each vehicle and can potentially subject GM to fines of up to $10,000 per vehicle." Id.; see Clean Air Act Secs. 203(a)(4)(B), 205, 42 U.S.C. Secs. 7522(a)(4)(B), 7524 (Supp. V 1981)
 
 
 [28]
 On November 26, 1980, EPA published a notice in the Federal Register declaring its partial approval and partial disapproval of GM's remedial plan to be "final." See 45 Fed.Reg. 78,798, 78,798 (Nov. 26, 1980). GM subsequently filed a protective petition, consolidated with its previous appeals, seeking review of this Federal Register notice
 
 
 [29]
 See 45 Fed.Reg. 36,396, 36,396-97 (May 30, 1980)
 
 
 [30]
 GM Brief at 12-22
 GM also argues that the rule must be considered legislative because of the limitations on judicial review imposed by the Act. GM Brief at 21-22. One of the distinguishing features of an interpretative rule is its lack of binding force upon courts; such rules are always subject to challenge in later judicial proceedings. See, e.g., Batterton v. Francis, 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977) ("[A] court is not required to give effect to an interpretative regulation."); Citizens to Save Spencer County v. EPA, 600 F.2d 844, 876 (D.C.Cir.1979); Joseph v. United States Civil Serv. Comm'n, 554 F.2d 1140, 1153 n. 24, 1154 n. 26 (D.C.Cir.1977); Gibson Wine Co. v. Snyder, 194 F.2d 329, 331-32 (D.C.Cir.1952); see generally 2 K. DAVIS, ADMINISTRATIVE LAW TREATISE Secs. 7:8, 7:13 (2d ed. 1979 & Supp.1982). However, section 307(b)(1) of the Act provides in relevant part:
 A petition for review of ... any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia .... Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register....
 42 U.S.C. Sec. 7607(b)(1) (Supp. V 1981) (emphasis supplied). Section 307(b)(2) goes on to provide that any "[a]ction of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement." 42 U.S.C. Sec. 7607(b)(2) (Supp. V 1981). Apparently, both GM and EPA read this language as rendering any rule, whether such rule was originally intended to be interpretative or legislative in character, binding on the courts if not challenged within 60 days after its promulgation. See GM Brief at 21-22; EPA Brief at 42-46; GM Reply Brief at 2-3, 14-19. Consequently, GM argues, if the review provisions render any nationally applicable regulation binding on the courts after 60 days, then all such regulations must by definition be legislative and not interpretative. See GM Brief at 21-22; GM Reply Brief at 14-19.
 The Supreme Court has previously taken note of the constitutional problems that review limitations such as section 307(b) may present. See, e.g., Harrison v. PPG Indus., Inc., 446 U.S. 578, 592 n. 9, 100 S.Ct. 1889, 1897 n. 9, 64 L.Ed.2d 525 (1980) (opinion of the Court); id. at 594-95, 100 S.Ct. at 1898-99 (Powell, J., concurring opinion); Adamo Wrecking Co. v. United States, 434 U.S. 275, 289-91, 98 S.Ct. 566, 575-76, 54 L.Ed.2d 538 (1978) (Powell, J., concurring opinion). The issue, however, has not thus far arisen in a posture that would permit its resolution, nor does it so arise in this case. Suffice it to say that a limitation on judicial review does not lend to an interpretative rule any binding force not already provided by the underlying statute. See Citizens to Save Spencer County v. EPA, 600 F.2d 844, 876 (D.C.Cir.1979). A court always has the power to substitute its judgment for that of the agency in the case of an interpretative rule, even though courts customarily accord some measure of deference to an agency's interpretation of a statute for which it has been assigned the responsibility for enforcement. See Batterton v. Francis, 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977); General Elec. Co. v. Gilbert, 429 U.S. 125, 141-42, 97 S.Ct. 401, 410-11, 50 L.Ed.2d 343 (1976); Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944); 2 K. DAVIS, supra, at Secs. 7:8, 7:13. Thus, in cases arising after the 60-day review period has expired, the court may undertake and enforce its own interpretation of the statute without reviewing the interpretative rule as such. And, in any event, the 60-day limitation period may not begin to run with respect to interpretative rules until a fact-based controversy is ripe for judicial review. See Baltimore Gas and Elec. Co. v. ICC, 672 F.2d 146, 147-50 (D.C.Cir.1982) (interpreting an analogous 60-day review limitation).
 
 
 [31]
 See Citizens to Save Spencer County v. EPA, 600 F.2d 844, 873-74 (D.C.Cir.1979)
 
 
 [32]
 Chamber of Commerce v. Occupational Safety and Health Admin., 636 F.2d 464, 468 (D.C.Cir.1980) (opinion of the court); id. at 471 (Bazelon, J., concurring opinion)
 
 
 [33]
 Id. at 468; Joseph v. United States Civil Serv. Comm'n, 554 F.2d 1140, 1153 n. 24 (D.C.Cir.1977); see generally 2 K. DAVIS, supra note 30, at Secs. 7:8-7:13, 7:15
 
 
 [34]
 See Columbia Broadcasting Sys., Inc. v. United States, 316 U.S. 407, 416, 62 S.Ct. 1194, 1199, 86 L.Ed. 1563 (1942); Chamber of Commerce, 636 F.2d at 468; Citizens to Save Spencer County, 600 F.2d at 879 n. 171
 
 
 [35]
 See Chamber of Commerce, 636 F.2d at 468; see also Udall v. Tallman, 380 U.S. 1, 16-17, 85 S.Ct. 792, 801-802, 13 L.Ed.2d 616 (1965); Energy Reserves Group, Inc. v. Department of Energy, 589 F.2d 1082, 1092 (Em.App.1978)
 
 
 [36]
 When the rule was first published it was classified as "interpretive" and described as
 set[ting] forth EPA's interpretation regarding one aspect of a motor vehicle or motor vehicle engine manufacturer's recall liability under section 207(c)(1) of the Clean Air Act .... EPA interprets this section as requiring manufacturers to submit a plan to remedy all vehicles within the class or category of vehicles subject to an ordered recall ... regardless of their age or mileage at the time of repair. The interpretation set out in this rule will provide guidance to vehicle and engine manufacturers to better enable them to submit acceptable remedial plans.
 
 
 [45]
 Fed.Reg. 36,396, 36,396-97 (May 30, 1980) (emphasis supplied). Throughout this litigation, EPA has never claimed any authority for its rule other than that conveyed by the statute itself. Thus, there is no need to turn to the effect of the rule in order to ascertain agency intent. If the effect of the rule exceeds that of the statute itself, then the rule will have surpassed the bounds of permissible statutory interpretation
 
 
 [37]
 Batterton v. Francis, 432 U.S. 416, 424, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977)
 
 
 [38]
 General Elec. Co. v. Gilbert, 429 U.S. 125, 142, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1976) (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944); see id. 429 U.S. at 141-42, 151-53, 97 S.Ct. at 410-11, 415-16; Batterton, 432 U.S. at 425 n. 9, 97 S.Ct. at 2405 n. 9 ("[A] court is not required to give effect to an interpretative regulation. Varying degrees of deference are accorded to administrative interpretations, based on such factors as the timing and consistency of the agency's position and the nature of its expertise.")
 
 
 [39]
 General Elec. Co., 429 U.S. at 143, 97 S.Ct. at 411
 
 
 [40]
 EPA argues that its interpretation is longstanding. Yet, with the exception of the dispute with GM leading to the promulgation of the May 30 rule, the agency can point to only one controversy, the Chrysler recall in February 1979, during which the useful life issue arose. See EPA Brief at 5 & n. 5. However, by the EPA's own admission, the agency did not press the issue with Chrysler, because the question of nonconformity was itself being litigated. See id. Thus, even assuming that a lifespan barely exceeding one year suffices to render an interpretation longstanding, it would appear that the public was never placed on notice with respect to EPA's interpretation
 The dissent contends that, nevertheless, the EPA interpretation should be considered longstanding precisely because the question of a manufacturer's liability for repair of vehicles beyond their useful lives has never previously arisen. See Dissenting Opinion at 1003 n. 5. Yet, this novel approach to defining "longstanding" interpretations is not supported by the cases on which the dissent relies. In Esquire, Inc. v. Ringer, 591 F.2d 796, 801 (D.C.Cir.1978), we did hold that an administrative interpretation that "has been consistently followed for a significant period of time" is entitled to judicial deference. Yet we found that the administrative interpretation under review in that case was longstanding, because it had been consistently asserted and followed by the agency since 1909 in the face of a long series of challenges. Id. at 802 & nn. 19-20. Similarly, in DeLano v. United States, 393 F.2d 517, 521-22, 183 Ct.Cl. 379 (1968), the railroad's failure to challenge overtime billing for customs inspections performed on board trains was seen as indicative of the "reasonableness" (not the longstanding nature) of the Immigration Service's interpretation of its overtime regulations. There, the agency's policy had been publicly announced and implemented for over 15 years. Id. 393 F.2d at 521. Railroads had been affirmatively required to pay on the basis of the agency's overtime interpretation. In the instant case, however, the EPA has previously announced its position only once and, in that instance, recanted. We are pointed to no other occasion on which the EPA required manufacturers to include vehicles beyond their useful lives in their remedial plans; the issue simply was never raised by either party.
 Judge Wald's view of the EPA's position as "longstanding" apparently presumes that manufacturers (1) prophetically foresaw EPA's heretofore unannounced interpretation of their liability for repair of vehicles beyond their useful lives; (2) conceded the "reasonableness" of EPA's position; and (3) therefore, "voluntarily" included older vehicles in their remedial plans, refraining from challenging this manifestly "reasonable" interpretation. A far more plausible explanation for the lack of 5/50 controversies avails itself. The statistical data supplied by the EPA indicates that, with the exception of the Chrysler and Cadillac recalls in which useful life disputes did arise, virtually all completed emissions recalls have involved vehicle classes less than three years of age at the time of owner notification of nonconformity by the manufacturer. See J.A. 278-96. The median class age is approximately 2.5 years; the mean, slightly less than 2.6 years, and the mode, less than one year. EPA data also reveal that, at an age of one year, only 2% of vehicles are likely to have exceeded 50,000 miles; at age 2, 6%; at age 3, 20%; at age 4, 39%; and at age 5, 60%. J.A. 274. Finally, EPA statistics indicate that the owner response rates drop substantially for vehicles more than four-years old (median owner response for vehicles between four and five years of age is between 20 and 30%, and no owner response is indicated for vehicles more than five years of age). See J.A. 298. This information forms a strong basis for the inference that both the EPA and manufacturers in previous recalls have failed to raise the question of liability for repair of cars beyond their useful lives because the involvement of such vehicles in the recalls has been de minimis. Few vehicles beyond their useful lives were putatively subject to recalls; of these, only a handful could have been expected actually to have been presented for repair. It simply would not have been economical for manufacturers to have expended the resources necessary to identify those vehicles beyond their useful lives or to risk owner alienation and possible reaction from the EPA (although the EPA's position concerning such matters was at the time unknown) by refusing to repair the tiny percentage of older cars which might have found their ways to dealerships in response to a recall.
 In contrast, in the two major recalls in which 5/50 limitations were imposed, a substantial percentage of the vehicles in the class were beyond their useful lives. The EPA recalled 1975 Chryslers in December 1976. J.A. 281. After a hotly contested dispute over the existence of the emissions nonconformity, Chrysler imposed a 5/50 limitation in December 1978. Id. At that point, the class was 51 months old and over 40% of the vehicles had exceeded their useful lives. Moreover, since Chrysler's appeal of the EPA's recall order was still pending in this court, virtually the entire class could have been expected to have exceeded their useful lives before owner notification took place. Similarly, in this case, the model was beyond the five-year point by February 1980 when, after a prolonged and often hostile negotiation process, GM finally imposed a 5/50 limitation on repair of its 1975 Cadillacs. See J.A. 286.
 The dissent responds that "in six out of the fifteen recalls described in detail in the record, ... the EPA issued a recall notice to the manufacturer 34-55 months after the cars were on the market." Dissenting Opinion at 1003 n. 5. However, we believe that the dissent's method of computation produces an inflated picture of the average age of recall classes. For example, the dissent includes two recalls which were incomplete at the time the record in this case was submitted. However, it is impossible to tell, until owner notification has begun, whether a manufacturer will ultimately assert a 5/50 limitation. For example, in this case GM submitted several remedial plans without asserting such a limitation; indeed, the 5/50 limitation was not imposed until after the EPA had approved GM's remedial plan. Thus, incomplete recalls are useless for purposes of discerning why manufacturers failed to impose 5/50 limitations prior to the Cadillac recall.
 The dissent also presents figures on three recalls that "involved" large numbers of older vehicles (1975 and 1976 Pontiacs, 1975 Fords, 1974 AMCs); yet, in each case, these vehicles were part of a larger recall class, spanning several model years, in which the majority of the cars involved were younger. We respectfully suggest that employing the mean age of the recall class as a whole would present a more accurate picture of the proportion of older cars in a given recall that the manufacturer might have had to fix without a 5/50 limitation. For example, 54% of the 1975 model Pontiacs may have been beyond their useful lives in 1979, yet 1975 Pontiacs represented only one-quarter of the cars involved in the Pontiac recall which included model years 1975-1978. Similarly, the 1978 Ford recall to which the dissent refers included 1975 and 1976 Fords, and the 1978 AMC recall spanned the model-years 1974 through 1976.
 The AMC recall points to another flaw in the dissent's statistical formulation. In that recall, the EPA ordered the recall of all 1976 AMC cars in May 1978. At that point, the model was approximately two-and-a-half years old and fewer than 20% of the vehicles could have been expected to have exceeded their useful lives. We are told that AMC "indicate[d] it [would] include 1974, 1975, and 1976 AMC cars sold in California in its plan." J.A. 291. The exact motive for this inclusion is not disclosed by the record, but it is clear that AMC included these vehicles voluntarily, perhaps out of a concern for their ability to meet more stringent California state emissions requirements. However, the dissent points to the 1974 AMCs included in this recall as evidence of a class involving large numbers of cars beyond their useful lives for which the manufacturers did not impose a 5/50 limitation. We would suggest, with all due deference, that such use of data is inappropriate (1) because only California vehicles from the 1974 and 1975 AMC model-years were included in the recall, thus making them a relatively small proportion of the recall class which was overwhelmingly composed of 1976 AMCs; and (2) these vehicles were included voluntarily, thus indicating the manufacturer's willingness to go beyond EPA's requirements.
 Finally, the dissent presents its data only in terms of the percentage of older cars it contends were present in the recall class; however, that figure must be multiplied by the projected owner response rate to determine the percentage of cars the manufacturer would have anticipated actually having to fix. Thus, even if 20% of the cars in a given class were beyond their useful lives at the time of owner notification, and a 20% owner response rate could be expected for those cars, only 4% of the cars presented for repair could be expected to be beyond their useful lives. (This figure, of course, would have to be adjusted by the response rates for vehicles of varying ages within their useful lives.) In fact, as indicated above, the response rate for vehicles beyond their useful lives approaches zero. Therefore, even assuming the statistical validity of the dissent's calculations, manufacturers in past recalls would have had to repair few, if any, vehicles beyond their useful lives, whether or not 5/50 limitations had been imposed.
 In the few recalls, other than the Chrysler and Cadillac recalls, in which significant numbers of vehicles beyond their useful lives were involved, potent reasons existed for the manufacturers to refrain from invoking 5/50 limitations. One manufacturer "requested additional time to develop a durable replacement component to use in a recall campaign." J.A. 268. The manufacturer's failure to adhere to its own production timetable resulted in approximately 70,000 vehicles (most of them apparently from earlier model years voluntarily included in the recall, see J.A. 291) having exceeded their useful lives by the time owner notification began. J.A. 268. Similarly, another manufacturer requested additional time to develop a less expensive remedial repair part, resulting in savings to the manufacturer of $3.2 million. J.A. 269. A third carmaker convinced the EPA to consent to two audited sample recalls in an unsuccessful attempt to demonstrate that defective carburetors could be repaired instead of replaced; the delays consumed three years. Id. Manufacturers who hope to call upon the EPA's good graces in the future are hardly in a position to invoke 5/50 limitations when the delays they have asked the EPA to tolerate in order to mitigate the expense of a recall result in large numbers of vehicles having exceeded their useful lives when presented for repair.
 Indeed, EPA provides information on only two completed recalls in which large numbers of vehicles beyond their useful lives could have been expected to have been presented for repair and special circumstances militating against a manufacturer's invocation of a 5/50 limitation were not involved. These were the Chrysler and the Cadillac recalls. In both, the manufacturers imposed 5/50 limitations. In the former, the EPA ultimately acceded to the limitation; in the latter, obviously, it has not. Such a history does not a "longstanding" interpretation make.
 
 
 [41]
 EPA Brief at 41
 
 
 [42]
 Whirlpool Corp. v. Marshall, 445 U.S. 1, 11, 100 S.Ct. 883, 890, 63 L.Ed.2d 154 (1980); Southeastern Community College v. Davis, 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979)
 
 
 [43]
 See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); Touche Ross & Co. v. Redington, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979); Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917); Symons v. Chrysler Corp. Loan Guar. Bd., 670 F.2d 238, 241 (D.C.Cir.1981); Higgins v. Marshall, 584 F.2d 1035, 1037 (D.C.Cir.1978), cert. denied, 441 U.S. 931, 99 S.Ct. 2051, 60 L.Ed.2d 659 (1979)
 
 
 [44]
 Clean Air Act Sec. 207(c)(1), 42 U.S.C. Sec. 7541(c)(1) (Supp. V 1981)
 
 
 [45]
 See EPA Brief at 22 & n. 26
 
 
 [46]
 GM Brief at 20; see id. at 19-20, 23-26
 
 
 [47]
 The dissent, like the EPA, makes much of the classwide nature of the manufacturer's remedial obligation. See Dissenting Opinion at 1002 - 1005, 1006, 1007 nn. 11 & 12, 18-19; see also infra note 50. Yet, assuming arguendo that it is the nonconformity of the class--and not the nonconformity of individual vehicles--that the statute requires manufacturers to remedy, see Dissenting Opinion at 1007 n. 11 ("Congress intended to provide classwide remedies for classwide ... defects that showed up during the useful life of the cars listed as representative samples of the class. A defective class--its members (sic )--can therefore be deemed 'nonconforming.' "), a manufacturer still need not "repair" vehicles beyond their useful lives to effect a remedy of the class. If a class is nonconforming when a representative sample of its members demonstrates nonconformity with emissions standards during the useful lives of the sample vehicles, then it follows that a class is restored to conformity when the EPA can no longer muster such a sample. Since vehicles beyond their useful lives can never form part of the sample upon which an inference of class conformity or nonconformity is founded, "repair" of such vehicles, as noted above, contributes nothing to the remedy of the class
 
 
 [48]
 See 45 Fed.Reg. 36,396, 36,397 n. 2 (May 30, 1980); EPA Brief at 20 n. 25
 
 
 [49]
 45 Fed.Reg. 36,396, 36,397 n. 2 (May 30, 1980)
 
 
 [50]
 The dissent's apparent approval of EPA's concession, see Dissenting Opinion at 1007 n. 12, is similarly inconsistent with the dissent's position that all vehicles which are part of a nonconforming class are subject to repair at manufacturer expense, see id. at 1002 - 1005, 1007 & n. 12. If, as the dissent believes, the "statute ... require[s] the manufacturers to include a car in their remedial plans if (1) a substantial number of cars exhibit nonconformity during their useful lives, and (2) the car is a member of that class," id. at 1002; see id. at 1006 n. 10, then the time of the onset of nonconformity in a particular vehicle should be irrelevant to the manufacturer's liability for repair of that car. Indeed, the dissent's analysis produces the "bizarre result," id. at 1002, that even the existence of an individual vehicle's conformity or nonconformity is beside the point; class conformity is all that matters! Id. at 1007 n. 11 ("Congress intended to provide classwide remedies for classwide design or performance defects that showed up during the useful life of the cars listed as representative samples of the class. A defective class--its members (sic )--can therefore be deemed 'nonconforming.' " (emphasis supplied)); id. at 1008 - 1009 ("The statute thus mandates classwide notice without limitation, and requires the manufacturer to repair all cars and engines 'with respect to which [such] notice is given.' " (emphasis and alteration in original)); id. at 1009 ("The statute may fairly be read to require classwide notice, regardless of whether some members of the class have exceeded their useful lives."); see generally id. at 1002 - 1005. Yet, pragmatically, the only way to remedy class nonconformity is by repairing individual vehicles. And, to paraphrase the familiar adage, "if it ain't broke, you can't fix it."
 
 
 [51]
 In this case, the samples appear to have been 14 or 15 cars of the 230-carburetor family and 8 of the 193-carburetor family. See J.A. 125, 170
 
 
 [52]
 See J.A. 35
 
 
 [53]
 See J.A. 123
 
 
 [54]
 Thus, contrary to the contention of the dissent, better than half of the cars in the class may not "have been riding the roads for years in violation of pollution standards." Dissenting Opinion at 1001. Moreover, whatever "public benefit" might be derived from improving the emissions performance of vehicles beyond their useful lives, see id. at 1001 - 1002, may not be achieved by imposing on manufacturers a liability beyond that which Congress has seen fit to prescribe
 
 
 [55]
 See S.REP. NO. 1196, 91st Cong., 2d Sess. 30 (1970), reprinted in 1 SENATE COMM. ON PUB.WORKS, 93RD CONG., 2D SESS., A LEGISLATIVE HISTORY OF THE CLEAN AIR AMENDMENTS OF 1970, at 430 (1974) [hereinafter cited as 1970 Legislative History ]. Indeed, Congress reduced the useful life to which emissions standards would apply from 10 years to 50,000 miles in response to industry representations that manufacturers could not guarantee conformity for a 10-year useful life. See id
 
 
 [56]
 See J.A. 165-67
 
 
 [57]
 See Chrysler Corp. v. EPA, 631 F.2d 865, 870-71 (D.C.Cir.1980)
 
 
 [58]
 The dissent complains that the "majority, in hypothesizing about possible future problems in the implementation of EPA's rule, exceeds the proper scope of an inquiry into the validity of a rule." Dissenting Opinion at 1008 n. 13. The dissent's concern for limiting the scope of our inquiry to the facts of this particular case might be well placed had the GM recall order alone been brought before this court for review. However, the dissent seems to have forgotten that we have also been called upon to review the validity of EPA's interpretative rule itself. See supra text accompanying note 28. It is clear beyond peradventure that the validity of a rule can be ripe for review whether or not it has actually been improperly applied and enforced in a concrete factual setting. See, e.g., FCC v. WNCN Listeners Guild, 450 U.S. 582, 585-86, 101 S.Ct. 1266, 1269-70, 67 L.Ed.2d 521 (1981) (reviewing the validity of a Policy Statement not then applied to any particular set of facts); Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 301-03, 99 S.Ct. 2301, 2310-11, 60 L.Ed.2d 895 (1979) (statutory procedures, restrictions, and penalties, though not invoked, are ripe for review); Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 81-82, 98 S.Ct. 2620, 2634-2635, 57 L.Ed.2d 595 (1978) (constitutionality of statutory limitation of liability for nuclear accidents ripe for review before any nuclear disaster occurs); National Wildlife Fed. v. Snow, 561 F.2d 227, 236-37 (D.C.Cir.1976); Continental Air Lines, Inc. v. CAB, 522 F.2d 107, 124-26, 128 (D.C.Cir.1975) (en banc); see generally 4 K. DAVIS, ADMINISTRATIVE LAW TREATISE Secs. 25:6--25:10 (2d ed. 1983)
 Taken on its face, the EPA rule would require cars beyond their useful lives to be brought into conformity with standards which do not apply to them. The EPA attempted at oral argument to salvage the rule from this conspicuous defect by asserting that the agency will not in fact require such vehicles to be brought into compliance with inapplicable standards but will instead require the same "repair" to be made on older and younger vehicles. If we have in any way "exceed[ed] the scope of [our] proper inquiry," it has been by giving any consideration to this post hoc rationalization of the agency's actions. See, e.g., Citizens To Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 419, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971); Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69, 83 S.Ct. 239, 245-46, 9 L.Ed.2d 207 (1962); SEC v. Chenery Corp., 332 U.S. 194, 196-97, 67 S.Ct. 1575, 1577-78, 91 L.Ed. 1995 (1947); SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943); Tabor v. Joint Bd. For the Enrollment Of Actuaries, 566 F.2d 705, 709-12 (D.C.Cir.1977); KIRO, Inc. v. FCC, 545 F.2d 204, 208 (D.C.Cir.1976). Nevertheless, out of deference to the agency we did consider EPA's extra-record gloss on its rule, but we found the modification to be as fatally flawed as is the rule itself. The fundamental difficulty with the "same repair" explanation, as discussed in text below, is its inconsistency with the statute: the Act requires not that a "repair" be performed, but that a nonconformity be remedied. Nearly as compelling, however, is the fact that EPA's modification will not alter the impermissible effect of the rule in many of the recalls to which the rule can reasonably be expected to apply. We have not had to "conjure up" or "hypothesize" situations in which the EPA's modified interpretation collapses. Indeed, we have had to look no farther than the last major EPA recall reviewed by this court, see Chrysler Corp. v. EPA, 631 F.2d 865, 870-71 (D.C.Cir.1980), to discover that requiring older vehicles to conform to inapplicable standards and requiring them to be subjected to "the same repair" as younger vehicles may amount to the same thing. In situations in which the required repair involves a fine-tuning process rather than a "fixed number of turns of the screwdriver," the EPA's modification represents, with respect to the rule itself, a distinction without a difference.
 The rule before us purports to require all manufacturers to include cars beyond their useful lives in their remedial plans. Were this court to uphold that rule, the rights of manufacturers would be "prejudiced prior to judicial review ... of some future recall." See Dissenting Opinion at 1008 n. 13. The age and mileage of a car would become irrelevant to the question of a manufacturer's liability for its repair in all future recalls. The EPA asks us to affirm such a blanket imposition of liability on the pretext that the manufacturer will be able to negotiate with the EPA the kind of repair for which liability may be imposed in the context of a particular recall. This so-called "flexibility," see id., will be scant help to manufacturers who would be estopped from contesting their liability for making some kind of repair on older cars in future recalls should this court approve EPA's interpretation of the recall provisions in this case.
 The EPA's interpretative rule, both on its face and as subsequently qualified by the agency, is clearly inconsistent with the statute. We need not wait to see the precise repair required in every future recall to declare as a general principle that the statute does not impose on manufacturers liability for repair of vehicles beyond their useful lives.
 
 
 [59]
 Even if the statutory language appeared clear, the plain meaning rule is only a primary and not a conclusive source of understanding and must yield on occasion to other indicia of legislative intent, including legislative history. See Chesapeake & O. Ry. Co. v. United States, 571 F.2d 1190, 1194 (D.C.Cir.1977); see also Watt v. Alaska, 451 U.S. 259, 266 & n. 9, 101 S.Ct. 1673, 1678 & n. 9, 68 L.Ed.2d 80 (1981); Aaron v. SEC, 446 U.S. 680, 705-08, 100 S.Ct. 1945, 1960-62, 64 L.Ed.2d 611 (1980) (Blackmun, J., concurring in part and dissenting in part)
 
 
 [60]
 S.REP. NO. 1196, 91st Cong., 2d Sess. 31 (1970), reprinted in 1 1970 Legislative History, supra note 55, at 431 (emphasis supplied)
 
 
 [61]
 The dissent also argues that the above-quoted language of the Senate Committee Report is irrelevant, see Dissenting Opinion at 1006, but on grounds which EPA failed to raise and to which, as a result, GM has been permitted no opportunity to respond. However, the dissent's discourse on the distinctions between the Senate bill and the Act as finally adopted falls far short of establishing the irrelevance of the Senate Report. To the contrary, the extended legislative history exhumed by the dissent lends further support to the conclusion that Congress did not intend that manufacturers be held liable for repair of vehicles beyond their useful lives. Judge Wald correctly observes that the Senate bill imposed no explicit repair obligation in its class notification provision; recall of the class was effectuated once the manufacturer notified the owners of all vehicles presumed to be within their useful lives. See id. at 1005 - 1006; see also S. 4358, 91st Cong., 2d Sess. Sec. 8 (1970), reprinted in 1 1970 Legislative History, supra note 55, at 574, 594-96 (amending Sec. 207(d) (now Sec. 207(c)) of the Act). Instead, the Senate version relied for a remedy upon the exercise of the bill's warranty provisions by the vehicles' purchasers in response to the class notification. See Dissenting Opinion at 1005 - 1006; see also S. 4358, 91st Cong., 2d Sess. Sec. 8 (1970), reprinted in 1 1970 Legislative History, supra note 55, at 574, 593-94 (amending Sec. 207(c) (now Sec. 207(a)) of the Act). The warranty section of the bill, in turn, provided that
 [e]very new vehicle or new vehicle engine ... shall be warranted by the manufacturer to ... remain in conformity with [emissions] regulations for the lifetime of such vehicles or engines if properly maintained, serviced, and operated. Operation for fifty thousand miles shall be taken as the basis for the lifetime of a vehicle or engine under this section.
 S. 4358, 91st Cong., 2d Sess. Sec. 8 (1970), reprinted in 1 1970 Legislative History, supra note 55, at 574, 593-94 (amending Sec. 207(c) (now Sec. 207(a)) of the Act).
 We note first that the dissent's interpretation of this section of the bill is inconsistent with its treatment of the recall provision of the Act. Neither the warranty provision nor the recall provision contains language explicitly exempting the manufacturer from liability for repair of vehicles which failed to conform to emissions standards during their first 50,000 miles but, for whatever reason, were not presented for repair until they were beyond their useful lives. Were the reasoning propounded by the dissent with respect to the Act's recall provision applied with equal vigor to the warranty provision, a car owner would be free to return a 60,000-mile vehicle to the dealer and demand repair of any defect that was present (or presumed to have been present) during that vehicle's first 50,000 miles. Nevertheless, the dissent appears to recognize the absurdity of such an interpretation in the warranty context and freely concedes that "[b]ecause the warranty obligation ended when the vehicle exceeded 50,000 miles, the manufacturer would not have been required to repair a car that had exceeded the warranty mileage, even though it was a member of the 'recall' class." Dissenting Opinion at 1006.
 Ultimately, the dissent's dismissal of the Senate Committee Report as irrelevant rests on a totally unfounded assumption: the Conference Committee, without comment or explanation, added to the recall provision of the Senate bill a totally "independent recall repair obligation in addition to the warranty obligation." Dissenting Opinion at 1006 (emphasis in original); id. at 1005. In contrast to the warranty repair obligation, which limited the manufacturer's liability for repair to a vehicle's useful life, this new recall repair obligation, Judge Wald would have us believe, exposes the manufacturer to liability for repair virtually indefinitely. To realize the full extent of the liability the EPA rule would impose on a manufacturer, it is important to bear in mind that a recall class may include vehicles or engines of more than one model year. For example, the same carburetor or engine component may be used in vehicles over the course of four or five model years. See, e.g., J.A. 293 (recall of 1975-1978 Pontiacs with EGR backpressure transducers). Under the interpretation espoused by EPA and the dissent, the manufacturer would be liable for the repair of all vehicles ever produced with that component, provided a sample of defective vehicles or engines still within their useful lives could be assembled for testing. Thus, if the Pontiac engine defect, for instance, had been discovered during the fourth year of the useful lives of the 1978 model Pontiacs, all Pontiacs manufactured with the suspect transducer would be subject to recall. The manufacturer would have been required to repair not only the four-year old 1978 models but also the 1975 Pontiacs, which, at the time the EPA would have issued its notification of nonconformity, would have been between nine- and ten-years old. And all of these vehicles would have been several years older still had the process of approving a remedial plan consumed as much time as it did in the present recall.
 One would expect such a drastic extension of the manufacturer's repair obligation to have attracted at least some debate. Certainly there were those in the Senate who believed even the limited five-year liability imposed by the warranty provision to have been excessive. See, e.g., 116 CONG.REC. 33,083, 33,093 (1970), reprinted in 1 1970 Legislative History, supra note 55, at 307-08, 330-31 (remarks of Senator Griffin); id. at 33,097, reprinted in 1 1970 Legislative History, supra note 55, at 338 (remarks of Senator Cooper); see also Administration's Letter to Conference Committee Recommending Certain Provisions (Nov. 17, 1970), reprinted in 1 1970 Legislative History, supra note 55, at 212-13 (expressing view of executive branch that 50,000-mile warranty was "inappropriate and unrealistic in the light of known technology and experience"). Particularly in the House, whose original bill to amend the Clean Air Act contained neither a recall nor a warranty repair obligation, see H.REP. NO. 1146, 91st Cong., 2d Sess. 11-13, 38-40 (1970), U.S.Code Cong. & Admin.News 1970, p. 5356; Dissenting Opinion at 12 n. 8, some comment on such a sweeping new imposition of repair liability would surely have arisen.
 Yet no such comment was made during either the House or the Senate debates on the Conference Committee Report; instead, the only discussion on amendments to Sec. 207 of the Act focused exclusively on the House's acquiescence in the Senate's proposed warranty repair obligation, which as the dissent admits, was limited to the five-year/50,000-mile vehicle useful life. See 116 CONG.REC. 42,520 (1970), reprinted in 1 1970 Legislative History, supra note 55, at 112 (House debate) (remarks of Representative Staggers); id. at 42,382, 42,385, reprinted in 1 1970 Legislative History, supra note 55, at 126, 134-35 (Senate debate) (remarks of Senator Muskie). Moreover, the comments of the House managers included in the Conference Committee Report explicitly state:
 The Senate [bill] ... authorized the Administrator, if he determined that any class or category of vehicles or engines did not conform with applicable emission standards, to require manufacturers to notify purchasers of such nonconformity. Moreover, if a manufacturer discovered such nonconformity during the term of any warranty required under the Senate [bill], he was required to notify purchasers of the nonconformity and to remedy such nonconformity at no cost to the owner.
 The conference substitute adopts substantially the provisions of the House bill relating to prototype and production line testing and the provisions of the Senate [bill] ... relating to compliance after sale and warranty.
 H.REP. NO. 1783, 91st Cong., 2d Sess. 50 (1970), reprinted in 1 1970 Legislative History, supra note 55, at 200 (Conference Report) (emphasis supplied), U.S.Code Cong. & Admin.News, 1978, pp. 5356, 5383. No mention of any extension of a manufacturer's liability for repair of nonconforming vehicles beyond the five-year/50,000-mile limits of the warranty period is made anywhere in the Conference Committee Report, although that Report purports to explain all but technical or clarifying changes made in Conference. Id. at 42, reprinted in 1 1970 Legislative History, supra note 55, at 192.
 Thus, it would appear that the alterations of the language of S. 4358 made in Conference were merely "technical, clarifying, and conforming changes." Id. The Conference Committee changes simply made the manufacturer's liability for repair in a recall situation, originally incorporated in the warranty provision, explicit in the recall provision itself. The warranty repair obligation and the recall repair obligation are clearly coterminous, their only difference being in their triggering agents--the individual consumer in the case of warranty repairs or the agency in recalls. Both obligations are limited in duration to the five years or 50,000 miles of a vehicle's useful life.
 
 
 [62]
 See S. 4358, 91st Cong., 2d Sess. Sec. 8 (1970), reprinted in 1 1970 Legislative History, supra note 55, at 574, 595-96 (amending Sec. 207(d)(2) (now Sec. 207(c)(1)) of the Act)
 
 
 [63]
 EPA Brief at 35 n. 44
 
 
 [64]
 EPA estimates that the "average time from recall order to owner notification is 8 1/2 months." EPA Brief at 28 n. 33; J.A. 268 & n. 6. However, this computation apparently includes time consumed in administrative and judicial challenges to the recall order. See EPA Brief at 28
 
 
 [65]
 EPA approximates the average time spent in such investigations as nine months. See J.A. 268 & n. 5
 
 
 [66]
 EPA provides no estimate of the average amount of time consumed in such appeals. However, the agency did note one recent recall in which nearly four years were expended in appeals:
 Of particular note is the recall of certain 1975 Chryslers ordered recalled on December 8, 1976 .... Although the recall was ordered relatively early in the life of the vehicles, Chrysler requested an administrative hearing on the Administrator's determination of nonconformity. The Administrative Law Judge upheld the determination in a decision filed on February 10, 1978. Subsequent appeals to the Administrator and this Court also resulted in decisions favorable to EPA. Chrysler Corp. v. EPA, [631 F.2d 865 (D.C.Cir.1980) ] .... Certiorari was denied by the U.S. Supreme Court on December 1, 1980 ..., when few, if any, of the 208,000 vehicles subject to the recall order were still within their useful lives.
 EPA Brief at 28 n. 35.
 
 
 [67]
 See S. 4358, 91st Cong., 2d Sess. Sec. 8 (1970), reprinted in 1 1970 Legislative History, supra note 55, at 574, 594-96 (amending Sec. 207(d) (now Sec. 207(c)) of the Act) (actual use testing); id., reprinted in 1 1970 Legislative History, supra note 55, at 574, 595-96 (amending Sec. 207(d)(2) (now Sec. 207(c)(1)) of the Act) (administrative hearings and review); id. Sec. 11(b), reprinted in 1 1970 Legislative History, supra note 55, at 612, 619-20 (inserting Sec. 308 (now Sec. 307(b)) of the Act) (judicial review); Administrative Procedure Act Sec. 10 (presently codified as amended at 5 U.S.C. Secs. 702, 704 (1982)) (judicial review)
 
 
 [68]
 "A decision not to require the manufacturer to repair the vehicle could be made after notice and after finding that the vehicle had exceeded the 50,000-mile warranty period." S.REP. NO. 1196, 91st Cong., 2d Sess. 31 (1970), reprinted in 1 1970 Legislative History, supra note 55, at 431
 
 
 [69]
 "The 50,000-mile period can be assumed to be 4 to 5 years and the manufacturer should be expected to notify any owner of a vehicle that is five years old or less ...." Id. (emphasis supplied)
 Of course, this language, standing alone, might permit an interpretation under which the manufacturer could be held liable for repair of vehicles which were within their useful lives at the time EPA notified the manufacturer of nonconformity but had exceeded their useful lives by the time they were presented for repair. Since EPA has not put forward such an interpretation, we have no occasion to rule on it. We do note, however, that legislative rulemaking might be required to resolve a number of implementation problems (e.g., a method for determining when a given car exceeded its useful life) before such an interpretation could be given effect.
 
 
 [70]
 See Chamber of Commerce v. OSHA, 636 F.2d 464, 469-70 (D.C.Cir.1980)
 
 
 [71]
 See Energy Consumers & Producers Ass'n v. Department of Energy, 632 F.2d 129, 142 (Em.App.1980)
 
 
 [72]
 Chamber of Commerce, 636 F.2d at 469
 
 
 [73]
 See EPA Brief at 30-33
 
 
 [74]
 116 CONG.REC. 33,094 (1970), reprinted in 1 1970 Legislative History, supra note 55, at 332
 During debate on the 1977 Clean Air Act Amendments, Senator Muskie commented:
 The actual life of a car is more than 50,000 miles. We all know that. It approaches 100,000 miles, I think, increasingly, but it was our feeling that a 50,000-mile warranty would put sufficient pressure on the manufacturers to meet the standards so that if they met them for 50,000 miles, the chances were that the standards would be met pretty closely for the car during all of its useful life, even if it extended beyond 50,000 miles.
 
 
 [122]
 CONG.REC. 24,302 (1976), reprinted in 6 SEN.COMM. ON ENVIRONMENT & PUB.WORKS, 95TH CONG., 2D SESS., A LEGISLATIVE HISTORY OF THE CLEAN AIR ACT AMENDMENTS OF 1977, at 5145 (1978)
 
 
 [75]
 S.REP. NO. 1196, 91st Cong., 2d Sess. 30 (1970), reprinted in 1 1970 Legislative History, supra note 55, at 430
 
 
 [76]
 The Senate Committee Report noted:
 The manufacturers informed the Committee that they would not be able to guarantee conformity with emissions standards for the anticipated 10-year life of a vehicle. The committee bill provides that 50,000 miles would be the maximum that a vehicle would be required to conform to the standards for which it was certified.
 Id. (emphasis supplied).
 The dissent attempts to offset the weight of these unequivocal indications of congressional intent to limit manufacturer liability to the five-year/50,000-mile vehicle useful life by pointing to a series of ambiguous remarks in the legislative history. These hyperbolic references assert EPA's power under the recall provision to order the repair of "an entire 'model or class,' " "a given model run," or "the entire lot" of vehicles. See Dissenting Opinion at 1003 - 1004.
 These statements accurately reflect the general rule. In an ordinary recall, the EPA discovers the defect sometime during the first two years of a model's life, orders the entire class or model recalled, and within eight months the vehicle owners are notified of the nonconformity by the manufacturer and are requested to bring their cars to the dealers for repair. See supra notes 40, 64; infra note 77. There are, however, obvious exceptions to the general rule which none of the passages cited by the dissent purports to address. For example, the recall provision explicitly exempts the manufacturer from liability for repair of vehicles not "properly used and maintained." See Clean Air Act Sec. 207(c)(1), 42 U.S.C. Sec. 7541(c)(1) (Supp. V 1981). Notwithstanding the EPA's general ability to order the manufacturer to repair an entire model or class, no one would argue that the EPA has the authority to order the manufacturer to repair vehicles that have not been properly used or maintained. Similarly, our analysis of both the language of the Act and its legislative history demonstrates that vehicles which have exceeded their useful lives are not part of the class subject to recall and repair under the Act.
 Generalized statements, such as those cited by the dissent, which make no attempt to take account of exceptions, shed little light on the proper resolution of this case which clearly poses an exceptional circumstance: a substantial number of cars beyond their useful lives when presented for repairs. See supra note 40. Certainly such generalizations do not negate the import of passages elsewhere in the legislative history which specifically address the limitations on the manufacturers' recall repair liability. Generalia specialibus non derogant. Cf. E. CRAWFORD, THE CONSTRUCTION OF STATUTES Sec. 167 (1940) (special provisions of statutes control when in conflict with general provisions); J. HURST, DEALING WITH STATUTES 59-61 (1982) (exceptions place general provisions in context).
 
 
 [77]
 According to EPA estimates, vehicles involved in recalls average 20,000 miles of use at the time of the recall order. See J.A. 268 n. 4
 
 
 [78]
 By acknowledging this "worst case" scenario, we do not, however, intimate that the EPA will be totally hamstrung in its efforts to enforce vehicle emissions standards. To begin, the EPA can minimize the degree of delay by expediting agency response at each stage of the administrative process. The agency can also seek early judicial enforcement of its recall orders when confronted with recalcitrance or foot-dragging on the part of manufacturers. See Clean Air Act Secs. 203(a)(4)(B), 204, 205, 42 U.S.C. Secs. 7522(a)(4)(B), 7523, 7524 (Supp. V 1981)
 Moreover, however significant the recall apparatus may be, it is not the only tool at EPA's disposal capable of inducing manufacturers to design vehicles which conform to emissions standards throughout their useful lives. The Act provides a number of alternative enforcement mechanisms; for example:
 
 
 [1]
 Section 206(a) requires EPA to certify, on the basis of extensive testing of prototypes, that each new vehicle produced will conform to emissions standards for five years or 50,000 miles. No manufacturer may produce or market vehicles not covered by such a certificate. 42 U.S.C. Sec. 7525(a) (Supp. V 1981)
 
 
 [2]
 Section 206(b) authorizes the EPA to conduct production line testing to determine whether vehicles being manufactured will conform to emissions standards for 50,000 miles. Suspension of the certificate of conformity is authorized if vehicles fail such tests. 42 U.S.C. Sec. 7525(b) (Supp. V 1981)
 
 
 [3]
 Section 207(a) requires a manufacturer to warrant that each vehicle sold is designed and built to conform to emissions standards and that its materials and workmanship are free from any defect which will cause it to fail to conform to emissions standards during its useful life. 42 U.S.C. Sec. 7541(a) (Supp. V 1981)
 
 
 [4]
 Section 207(b) further requires a manufacturer to warrant that performance of major emissions components of each vehicle will conform to emissions standards for five years or 50,000 miles. 42 U.S.C. Sec. 7541(b) (Supp. V 1981)
 
 
 [5]
 Sections 203(a) and 205 authorize imposition of penalties of up to $10,000 per vehicle against a manufacturer which violates any of these requirements or which fails to perform warranty repairs. 42 U.S.C. Secs. 7522(a), 7524 (Supp. V 1981)
 
 
 [79]
 We note, for example, that the Administrator has substantial discretion in defining by regulation the useful lives of vehicles under the Act. See Clean Air Act Sec. 202(d), 42 U.S.C. Sec. 7521(d) (Supp. V 1981). Perhaps a legislative regulation providing that the useful life of vehicles in a class be tolled at the time the Administrator notifies the manufacturer of the nonconformity of that class would protect the recall system from manufacturer-induced delays
 The dissent expends considerable effort attempting to demonstrate the infeasibility of this suggestion. See Dissenting Opinion at 1001 n. 3, 1007 - 1010. The short answer seems obvious: if this particular proposal will not work, then the agency will have to devise an alternative regulatory solution, make do with presently available enforcement mechanisms, see supra note 78, or turn to Congress for remedial legislation. The failure of one regulatory alternative does not license the agency to disregard the limits Congress has imposed on its authority.
 We cannot, of course, prejudge the validity of a regulation that is not before this court. We would, however, point out that a tolling provision is not as clearly precluded by the statute, nor by the reasoning of our opinion, as the dissent would have us believe. It is true that Congress has fixed the useful life of light-duty vehicles, such as automobiles, at five years or 50,000 miles. See Clean Air Act Sec. 202(d)(1), 42 U.S.C. Sec. 7521(d)(1) (Supp. V 1981); Dissenting Opinion at 3 n. 3. That the EPA may not alter that limitation by regulatory fiat is the point of our opinion. However, Sec. 202(d) directs the Administrator to "prescribe regulations under which the useful life of vehicles may be determined for purposes of ... section 7541 of this title." 42 U.S.C. Sec. 7521(d) (Supp. V 1981). This language may be sufficiently elastic to permit the EPA to promulgate regulations prescribing how the five-year/50,000-mile useful life will be measured for recall purposes. If so, a vehicle's age and mileage could be tolled whenever the EPA issues a recall order for vehicles of its class.
 The dissent suggests that even if a tolling provision were permissible under the statute, such a regulation would suffer the same flaw as does the rule before us in this case--"[e]ither one would require the repair of vehicles beyond the age limits set by Congress ...," i.e., vehicles to which emissions standards no longer apply. Dissenting Opinion at 1001; see id. at 1007 - 1010. This contention is difficult to comprehend. Under a tolling provision, a vehicle's constructive life, not its actual life, would govern its eligibility for recall and repair. Thus, if a car were two-years old when the EPA issued a recall order, but was six-years old by the time the recall was ultimately put into effect by the manufacturer, the vehicle's constructive age would be two years. Such a vehicle would be subject to the same standards that applied to it at (actual) age two.
 We offer the suggestion of a tolling provision, not out of a sense that it is the only way--or even the best way--for the agency to administer the recall provision. Rather, we are sympathetic to the predicament of the agency which may be hampered in its exercise of its recall powers should manufacturers take advantage of this loophole in the Act to evade their recall repair obligations. Ultimately, however, it is not the responsibility of this court to provide "a principled exception" to a limitation established by Congress. See Dissenting Opinion at 1007. If, indeed, a "statutory straightjacket" is involved in this case, see id., it is one into which the EPA has been laced by Congress, not by this court. It is to Congress that the agency will have to turn for relief.
 
 
 [80]
 Office of Consumers' Counsel v. Federal Energy Regulatory Comm'n, 655 F.2d 1132, 1152 (D.C.Cir.1980)
 
 
 [81]
 Even if it were allowed to stand, the GM order would by now be virtually moot. The class as a whole is nine-years old, and, by EPA's own admission there is little likelihood that owners would respond to a recall order at this point. See EPA Brief at 29 n. 37; see also J.A. 298
 
 
 [1]
 As amended, 42 U.S.C. Sec. 7541(c)
 
 
 [2]
 The dissent fails to understand that an agency determination of nonconformity, which turns on the car's age or mileage at the time of notice, can nonetheless trigger a fixed repair obligation. See Dissent op. at pp. 1006 - 1007
 
 
 [3]
 See Court opinion, TAN 59-76. While I agree with Judge Bazelon's analysis of the legislative history as the best possible out of a murky series of legislative events, Judge Wald seems convinced by a different and strained interpretation supporting her idea of what the EPA should do. Why not just look at the statute? To me the words convey a simple, definite description of an effective enforcement scheme not found in their foggy legislative ancestry
 
 
 [4]
 Cf. Court opinion, note 79
 
 
 [5]
 To my interpretation Judge Wald's heavy criticism cannot possibly apply:
 [The panel's decision] permits automobile manufacturers to circumvent in large part or even altogether section 207's recall and repair obligations through a strategy of engaging in prolonged litigation.
 Dissent op. at 1000-1001.
 To this she compares Judge Bazelon's frank acknowledgment of administrative difficulties if EPA proceeds along some optional lines. See Court op. TAN 78. By my interpretation of the statute there could never be any incentive for prolonged delay by the manufacturer, nor would any car involved in a recall be exempted from the repair obligation.
 
 
 [1]
 Courts should pay special deference to the agency's interpretation when, as here, (a) the agency is interpreting a statute it is charged with administering, (b) the interpretation has been consistently adhered to, see infra note 5, (c) Congress has acquiesced to the administrative interpretation, see infra at 1003 - 1005, and (d) the statute gives the agency substantial discretion in administering and designing an enforcement scheme, see 42 U.S.C. Sec. 7541(c)(1), (2). See National Wildlife Fed'n v. Gorsuch, 693 F.2d 156, 166-69 (D.C.Cir.1982) (enumerating "[t]he usual factors ... (regulatory agency, consistency, contemporaneous construction, expertise, congressional acquiescence, thoroughness) [that] generally support giving great deference to EPA's interpretation"); Wilderness Soc'y v. Morton, 479 F.2d 842, 864-67 (D.C.Cir.) (en banc), cert. denied, 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973)
 
 
 [2]
 The EPA explained with specificity the purposes of section 207 when the interpretative rule was promulgated, and warned that those purposes could be undermined in the absence of the rule:
 The recall program has two objectives: 1) To assure that manufacturers repair vehicles which are exceeding the emission standards if maintained and used and the nonconformity occurs within the useful life of the vehicles, and 2) to encourage manufacturers to build durable emission-related components to assure that vehicles will not manifest excessive emissions during their useful lives. Both of these objectives are frustrated by an interpretation of useful life which limits manufacturers' liability only to vehicles which are within their useful life at the time of repair.
 
 
 [45]
 Fed.Reg. at 36,397
 
 
 [3]
 The majority suggests that EPA may redress this "difficulty" through the adoption of "a legislative regulation providing that the useful life of vehicles in a class be tolled at the time the administrator notifies the manufacturer of the nonconformity ...." Maj. Op. at 998 n. 79. However, contrary to the majority's belief that "the Administrator has substantial discretion in defining ... the useful lives of vehicles," id., the statute appears to limit that discretion to exclude "light duty vehicles and light duty engines." 42 U.S.C. Sec. 7521(d)(1); see Harley-Davidson Motor Co. v. EPA, 598 F.2d 228, 230 (D.C.Cir.1979) (Bazelon, J.). Passenger cars, of course, are light duty vehicles
 
 
 [4]
 As the EPA, when issuing the interpretative rule, emphasized: "interpreting section 207(c)(1) as imposing a useful life limitation on vehicles eligible for repair under a remedial plan could severely limit the number of nonconforming vehicles repaired pursuant to recall orders, could seriously impact ambient air quality, and would frustrate the intent of Congress." 45 Fed.Reg. at 36,398
 
 
 [5]
 The majority attempts to make light of the EPA's historical adherence to its current interpretation. The majority asserts that the EPA interpretation has only "a lifespan barely exceeding one year" because the sole controversy over the interpretation occurred in 1979. But, as EPA observed when it issued its interpretative rule, "[i]n the past, manufacturers have not conditioned a vehicle's eligibility for recall repair ... on the basis of the vehicle's age or mileage." 45 Fed.Reg. at 36,397. Rather than diminishing the rule's status as a longstanding EPA interpretation, the absence of any prior controversy over the repair of cars past their useful lives demonstrates the reasonableness of EPA's interpretation of its own regulatory scheme. See, e.g., Esquire, Inc. v. Ringer, 591 F.2d 796, 801 (D.C.Cir.1978) (Bazelon, J.) (administrative interpretation deserves "controlling weight," particularly when it "has been consistently followed for a significant period of time"), cert. denied, 440 U.S. 908, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979); DeLano v. United States, 393 F.2d 517, 521, 183 Ct.Cl. 379 (1968) ("A strong indication of the reasonableness of that [administrative] construction is the fact that [the regulated parties] never challenged it" even though it was "consistently maintained by the agency."). Apparently, virtually every manufacturer engaging in a recall has voluntarily included older cars in its own remedial plans
 The majority mistakenly claims that "manufacturers in previous recalls have failed to raise the question of liability for repair of cars beyond their useful lives because the involvement of such vehicles in the recalls has been de minimis." Maj. Op. at 985 n. 40 (emphasis in original). The majority has lost sight of the facts. Despite the majority's view that "virtually all" recalls involved "tiny percentage[s] of older cars," id., in six out of the fifteen recalls described in detail in the record, see J.A. at 278-96, the EPA issued a recall notice to the manufacturer 34-55 months after the cars were on the market. Under EPA's method of calculating the percentage of cars recalled that were beyond their useful lives, see J.A. at 275 (endorsed by majority at Maj. Op. at 985 n. 40), these recalls involved large quantities of older cars. For example, the Pontiac recall, initiated in 1979, involved 1975 model year cars, 54% of which were beyond their useful lives. See J.A. at 293. Moreover, almost 30% of the 1976 Pontiacs involved in that recall had exceeded their useful lives at the time of manufacturer notice. Similarly, in 1978 EPA initiated a recall that included 1975 Fords, approximately 28% of which had exceeded their useful lives. See J.A. at 289. Also, in 1978 the EPA began a recall that included 1974 AMC cars sold in California, approximately 56% of which were beyond their useful lives. See J.A. at 291-92. Any manufacturer who "prophetically foresaw" the majority's position, Maj. Op. at 13 n. 40, believing these recalls exceeded the legal scope of coverage, could reasonably have been expected to make an objection.
 At least three other recalls included substantial numbers of older cars. See J.A. at 280 (1974 Pontiacs; approximately 22% beyond useful lives); J.A. at 288 (1975 Fords; approximately 16% beyond useful lives); J.A. at 296 (1977 Buicks; approximately 28.5% beyond useful lives). The majority objects that some of the recalls mentioned herein "were incomplete at the time the record in this case was submitted (thus leaving the court without information concerning whether 5/50 limitations were ultimately imposed)." Maj. Op. at 985 n. 40. Only two of the recalls mentioned--the 1977 Buick recall, and the AMC recall--fit this description. In both cases, the manufacturer had already submitted a remedial plan without asserting the 5/50 limitation. See J.A. at 291-92, 296. Moreover, the EPA had already approved the AMC remedial plan as to six-cylinder vehicles. See J.A. at 291.
 Finally, the majority argues that "even if 20% of the cars in the class were beyond their useful lives at the time of owner notification, ... a 20% response rate could be expected for those cars, [and] only 4% of the cars presented for repair could be expected to be beyond their useful lives." Maj. Op. at ---- n. 40. Thus the majority declares that even 20% of the recall class is "de minimis." Such statistical sport, of course, ignores the fact that the manufacturer incurs heavy costs--both financial and as to good will--simply by issuing its notice to owners. Moreover, under the majority's reasoning virtually no recalls could involve a significant percentage of older vehicles. As time goes by, the percentage of older cars in the recall class rises, see J.A. at 275, but the response rate declines commensurately, see J.A. at 298. In fact, following the majority's reasoning, GM had no good reason to raise its challenge in this case. At the time of the EPA notice, only approximately 13.5% of the Cadillacs in the recall class had exceeded their useful lives. At the time that GM first raised the 5/50 objection, a 35% response rate could have been expected. See J.A. at 298. Accordingly, following the majority's methodology, only 4.7% of the older Cadillacs in the recall class would actually have been repaired. Yet in this case the manufacturer saw fit to pursue this challenge; I think it reasonable therefore to believe that other manufacturers would have done likewise in the past.
 
 
 [6]
 The majority appears to believe that the exemption excluding vehicles not "properly used and maintained" from the manufacturer's recall repair obligation somehow undercuts the EPA's class based approach. See Maj. Op. at 997 n. 76. This exemption--unlike the exemption the majority creates--is established by express statutory language. See 42 U.S.C. Sec. 7541(c)(1). The majority neglects the significant difference between statutory language and judicial innovation
 
 
 [7]
 As noted above, the Senate bill included no five-year limit on the "useful life" of cars and engines. The Committee, therefore, anticipated that some cars could be many years old and yet still be within their useful lives
 
 
 [8]
 The House bill contained no "recall" provision whatsoever. See H.Rep. No. 1146, 91st Cong., 2d Sess. 11-13 (discussion of "Automotive emission control provisions"). The House bill included only a design warranty requirement, see id. at 998 (section 206(e) of H.R. 17255), and an EPA authorization to halt manufacture of new cars if it determined that the engines or vehicles being produced did not comply with the standards, see id. at 997 (section 206(b) of H.R. 17255)
 
 
 [9]
 The majority suggests that the Congress' rewrite of the recall provision in conference was a meaningless gesture, signifying nothing. See Maj. Op. at 993 - 994 n. 61. While the urge is strong to pass this one by ("Let the long contention cease! Geese are swans and swans are geese!" M. Arnold, The Last Word ), I will respond briefly
 Attempting to transform the absence of comment on a conference committee amendment into a positive indication of legislative intent to make no change contravenes two established principles of statutory construction: (1) "an amendment indicates that [the legislature] thereby intended to change the original [bill] by creating a new right or withdrawing an existing one," 1A C. Sands, Statutes and Statutory Construction Sec. 22.30, at 178 (4th ed. 1972), and (2) "[t]he presumption against interpreting a statute in a way which renders it ineffective is hornbook law," FTC v. Manager, Retail Credit Co., 515 F.2d 988, 994 (D.C.Cir.1975). Moreover, the search for significance in legislative silence is at best a hazardous enterprise. See, e.g., Scripps-Howard Radio v. FCC, 316 U.S. 4, 11, 62 S.Ct. 875, 880, 86 L.Ed. 1229 (1942). When Congress does not say anything other than in the statute itself, that is where we look for guidance. Thus, the majority cannot reasonably rely on congressional silence to invalidate an otherwise reasonable EPA rule, especially when, according to its own admission, it "render[s] useless" the statutory provision itself.
 
 
 [10]
 The majority relies almost entirely on this one passage to support its central arguments as to congressional intent. See Maj. Op. at 992 - 996. It does cite a few additional passages as evidence that "Congress intentionally limited the duration of a manufacturer's liability for a vehicle's conformity to standards to a five-year/fifty thousand-mile period...." Id. at 996 (emphasis omitted); see also id. at 996 - 997 n. 76 (reiterating same point). These additional passages, however, demonstrate nothing more than a congressional purpose--clearly evidenced by the statutory language, see 42 U.S.C. Sec. 7521(d)--to define and limit the "useful life" term as it legitimately applies throughout the statute. The question presented by this case, not solved by the definition of "useful life," is whether a member vehicle or engine of a recalled class that has exceeded its useful life should nevertheless be repaired by the manufacturer
 
 
 [11]
 This semantic argument assumes away the plain language of section 207. See supra at 1002 - 1003. It is evident from the statutory language and legislative history, see supra at 1002 - 1005 that Congress intended to provide classwide remedies for classwide design or performance defects that showed up during the useful life of the cars listed as representative samples of the class. A defective class--its members--can therefore be deemed "nonconforming."
 
 
 [12]
 As demonstrated supra at 1002 - 1003, the Congress authorized EPA to order recall of a vehicle once it determines that (1) a class of cars exhibited nonconformity during their useful lives, and (2) the particular car belongs to that class. The first determination requires that the EPA test sample consist of cars that have not exceeded their useful lives. The EPA then may recall any car within the class represented by that sample
 The EPA's rule absolves manufacturers of the responsibility "to remedy the nonconformity of a vehicle which, although part of the recall class, experienced nonconformity only after expiration of the vehicle's useful life." 45 Fed.Reg. at 36,397 n. 2. The majority finds fault with this so-called "concession," saying that it "erodes [EPA's] class-based theory" and "offers little relief to manufacturers in practice." Maj. Op. at 990.
 I find this rule perfectly consistent with the statutory scheme. Cf. Maj. Op. at 989 n. 50. Congress obviously intended EPA to conduct tests on representative samples and to recall cars on the basis of the results. Unless Congress wanted EPA to test every car in a class, Congress was willing to allow such a statistical inference. Contrary to the majority's unnecessarily rigid--even stolid--view of my reasoning, see id. (characterizing "the dissent's position that all vehicles which are part of a nonconforming class are subject to repair at manufacturer expense") (emphasis in original), I believe the EPA sensibly interpreted the statute's statistical inference to permit exceptions upon an adequate showing by the manufacturers. Thus EPA's rule simply permits the manufacturers to rebut this statistical inference.
 The majority also criticizes the statistical inference by questioning the adequacy of EPA's sampling. See Maj. Op. at 990. This criticism, of course, does not undercut EPA's interpretative rule. Instead, it merely questions EPA's implementation of the rule in this case. I note that General Motors has not questioned the adequacy of the EPA testing in this case. Indeed, GM in its brief stated that subsequent to the EPA tests, "GM and EPA worked out a test program, to be done by GM with EPA's participation .... GM concluded that a noncompliance existed and suggested a repair method in February, 1977." GM Brief at 35-36 (emphasis added).
 Finally, the majority decries EPA's rule because "such a showing [of compliance within the useful life] may be impossible with respect to cars that have exceeded their useful lives when presented for repair." Maj. Op. at 991. Given the evident congressional intent to trigger recalls by the testing of classwide samples, I believe the burden of exemption from the recall repair obligation properly falls upon the manufacturers. In fact, I see no other practical way of implementing the majority's own proposed "legislative rule" or the rule suggested in Judge Wilkey's concurrence. Under either proposal, cars within their useful lives at the time of the EPA notice of noncompliance would be repaired at the manufacturer's expense even though they exceeded their useful lives by the time the recall actually occurred. See Maj. Op. at 998 n. 79; Conc. Op. at 1000. Either rule would have to presume that some cars, out of compliance and past their useful life at the time of repair, violated the emission standards during their useful life.
 
 
 [13]
 EPA has explained that GM would be required to perform only the same repair on the "older cars" that GM must perform on the "younger cars." See Maj. Op. at 998. The majority condemns the EPA rule, so read, for mandating "manipulation[s]" that do not "remedy a nonconformity as the statutory language clearly contemplates," id. at 999 (emphasis omitted)
 The majority, in hypothesizing about possible future problems in the implementation of EPA's rule, not presented by this case, exceeds the proper scope of an inquiry into "the validity of the rule." Maj. Op. at 991 n. 58. The rule requires manufacturers simply to devise plans for the "remedy [of] all properly maintained and used vehicles which experienced the nonconformity during their useful lives ...." 45 Fed.Reg. at 36,39 8. Such a requirement is neither per se unreasonable nor invalid on its face. The "remedy" required by the rule for older cars may well not turn out to be as burdensome as the majority seems to believe. See Association of Nat'l Advertisers, Inc. v. FTC, 617 F.2d 611, 621 (D.C.Cir.1979) ("it may be that this provision will unlawfully burden rights ... but in this situation, when the precise operation and impact of the requirement are unsettled, it is best for the judiciary to stay its hand until the provision in fact does result in the consequences appellants predict") (emphasis in original), cert. denied, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980).
 Furthermore, the application of the rule in this case is unquestionably reasonable. The remedial plan before us involves a few turns of a screwdriver, and it is not for this court to conjure up more complex remedial situations. See, e.g., National Automatic Laundry & Cleaning Council v. Shultz, 443 F.2d 689, 703 (D.C.Cir.1971) (courts should avoid decisions "that cannot be meaningfully analyzed without the aid of concrete factual backgrounds"); National Wildlife Fed'n v. Goldschmidt, 677 F.2d 259, 263 (2d Cir.1982) ("A decision by us at this stage would resolve a dispute about a hypothetical highway. Courts have no business adjudicating the legality of non-events."). The EPA in oral argument attested to its flexibility in devising reasonable remedial schemes to fit other, more problematic, design and performance violations. Whether the rule will be applied reasonably to such violations should be left to future cases. See, e.g., Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49, 87 S.Ct. 1507, 1515-16, 18 L.Ed.2d 681 (1967) (courts should not interfere with administrative decisionmaking until "its effects [are] felt in a concrete way"); National Automatic Laundry, 443 F.2d at 703 (observing "the need for restricting [judicial] rulings to broad questions fairly presentable in a litigation, without reaching questions of particular application that warrant separate consideration at a later time, if and when they arise"). The EPA rule does not set out any particular repair schemes; accordingly, this court's review of "the validity of the rule" does not, in my view, legitimate its current foray into purely theoretical future implementation problems.
 If the lack of a decision on this question created substantial hardship to private regulated parties, then judicial intervention might be proper. See, e.g., Abbott Laboratories, 387 U.S. at 149, 87 S.Ct. at 1515; Gulf Oil Corp. v. United States Dept. of Energy, 663 F.2d 296, 311-12 (D.C.Cir.1981). But the recall system imposes no risk upon the auto manufacturers that their rights could be prejudiced prior to judicial review of some future recall. Thus, I do not believe the majority properly exercises its reviewing function when it today invalidates a rule on the basis of problems not squarely presented to this court, and without affording EPA the opportunity to find methods of addressing such problems in a real--not hypothetical--situation.
 I also note that these same remedial problems would plague the majority's "legislative rule" and Judge Wilkey's proposed "mathematical" solution. Both approaches would likewise require the remedial scheme to include some cars that have passed their useful lives, and so are equally obliged to address what standards should be employed in the repair of such older cars. In fact, many of the same problems inhere in remedying a class of cars all the members of which are still within their useful lives. Should the car with 49,999 clocked miles be repaired in the same way or according to the same standard as the car with 100 miles? Again, this is a question for another day. Given Congress' purpose to ensure that manufacturers build cars to conform with emission standards over their entire useful lives, however, I find nothing outrageous in requiring manufacturers to repair at some point the very defects that caused a class of cars to fail to meet those standards during their useful lives.
 
 
 [14]
 The majority cites other enforcement mechanisms created by the Clean Air Act, as if their existence excuses the gutting of section 207(c). See Maj. Op. at 997 n. 78. However, the certification provisions of the Act, 42 U.S.C. Sec. 7525(a), (b), do not create a remedy for consumers who have already purchased defective vehicles or engines; instead, under the provision the EPA may only revoke the classwide manufacturing certificate, thereby preventing further future sales from the defective class of items. In addition, the performance and design warranty provisions, id. Sec. 7541(a), (b) do not employ EPA oversight and testing capabilities; instead, they rely on individual consumers to detect that their cars are exceeding emission standards. Thus, the recall provision occupies an important position in the enforcement scheme: it combines the EPA role of conducting investigations of classes of vehicles and engines (also present in the certification provisions) and the purpose of policing on-the-road vehicles and engines (also present in the warranty provisions)
 
 
 [15]
 In a final assault, the majority peremptorily declares this case to be "virtually moot." Maj. Op. at 999 n. 81. The meaning and legal significance of "virtual mootness" is, of course, mysterious; for if this case were "truly moot," the entire majority opinion would be dictum. In any case, the majority teases the auto manufacturers with yet another legal doctrine with which to circumvent the clear purposes of the Clean Air Act. This final aside, id., seems particularly inappropriate considering this court's own contribution to the long pendency of this case